# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MEGON WALKER,<br><br>Plaintiff,<br><br>         -against-<br><br>President and Fellows of HARVARD COLLEGE, also known as HARVARD CORPORATION, ELLEN COSGROVE, LLOYD WEINREB, BRADLEY HAMBURGER, and LINDSAY KITZINGER | Case No.<br><br>**COMPLAINT FOR BREACH OF CONTRACT, INTERFERENCE WITH CONTRACT AND BUSINESS ADVANTAGE, LIBEL, AND WRONGFUL INFLICTION OF EMOTIONAL DISTRESS, AND REQUEST FOR INJUNCTIVE RELIEF** |

## <u>INTRODUCTION</u>

1.   Plaintiff Megon Walker ("plaintiff") is a well-educated and skilled lawyer and PhD scientist who was, at the time of the events alleged herein, a highly-regarded, third-year law student at the Harvard Law School (the "Law School" which at all times alleged herein was acting as part of and for defendant Harvard Corporation, or "Harvard"). Because of her academic performance before and during Law School, as well as by her work as a summer law clerk at two respected law firms, plaintiff had, in the fall of 2008, received employment offers for high-paying attorney positions at both law firms. She accepted one of these and was to start work in the late summer or early fall of 2009. Her professional future seemed secure and filled with promise -- a promise earned by her diligence throughout her long, unblemished, and distinguished academic career.

2.   However, in the early spring of 2009, that future was destroyed by the wrongful actions of defendants including the Law School, acting through its Associate Dean and Dean of Students Ellen Cosgrove, Administrative Board chairperson and Dane Professor of Law Lloyd

Weinreb, third-year law students Bradley Hamburger and Lindsay Kitzinger, and others not named herein. In violation of plaintiff's rights, these defendants acted together to falsely charge plaintiff with plagiarizing portions of a draft law article she had been writing for publication in the Law School's *Journal of Law and Technology* ("JOLT"), one of the law journals operated at the Law School to publish scholarly work by students and other contributors. Plaintiff had worked on the draft. When it was nearing completion, the draft was badly damaged because the laptop computer on which she had saved the draft suffered a virus. Harvard disconnected her computer from the Harvard Network in order to quarantine the virus from spreading throughout the Law School computer system. The draft was severely damaged. It could thereafter be salvaged only in a fragmented and incomplete state, missing many of the portions that plaintiff had written.

3.  Because her article was supposed to have been turned in to the JOLT Editors just after her draft was damaged, plaintiff gave a copy of what she could salvage of the draft to JOLT, but informed JOLT Editors-in-Chief defendants Hamburger and Kitzinger and various members of the JOLT editorial board that the draft was not finished, that it needed extensive work because her computer had malfunctioned causing her to lose portions of the draft, and that it was therefore not ready for final submission. Ignoring plaintiff's explanation that the draft was not finished, defendants Kitzinger and Hamburger refused plaintiff's repeated requests to do further work on the draft, most specifically to allow her to substantively revise, shorten and proofread the draft, to rewrite sections of the draft, and to make the proper source credits in the draft article. Instead, they treated the draft as finished and finally submitted even though it was clearly fragmented and incomplete. Defendants Hamburger and Kitzinger claimed to the Law School's Administrative Board (which handled disciplinary matters) that plaintiff had plagiarized

by not giving proper credit to various sources for the text used in her draft. They noted some incomplete source attributions, but failed to disclose that plaintiff had stated her intentions to add those sources and had given the full-text sources to JOLT just after she turned in her incomplete draft. Hamburger and Kitzinger thus treated as final and plagiarized an incomplete draft that had some missing sources because of a computer virus.

4.   This was a false claim of plagiarism which should never have been made because plaintiff's draft article was not finished and plaintiff had said so multiple times to various JOLT editorial board members, doing so in person, via email, and by phone. Thus she had not committed plagiarism as defined by the Law School because plaintiff had not submitted her article for publication, nor had she attempted to deceive or actually deceived anyone into thinking that the draft article was a completed work that had all the source credits in place as would be the case in a final, submitted draft. As a result of this referral to the Administrative Board, plaintiff was charged with academic dishonesty, and a hearing was held on the plagiarism charge by the Law School's Administrative Board.

5.   In prosecuting this charge defendant Harvard was contractually obligated to follow the rules as set forth in the Law School's *Handbook of Academic Policies* and its *Rules Relating to Law School Studies* (the "Student Handbook"). Those rules constitute a contract between Harvard and its students. The defendants did not follow those rules thus causing defendant Harvard to breach its contractual obligations to plaintiff in numerous respects. First, the plagiarism charge against plaintiff was for an act that was not plagiarism as defined by the Student Handbook. Second, the proceeding against plaintiff ignored many of the Student Handbook's stated procedures for how hearings on such charges would be conducted. The procedures ignored were central to a fair hearing. As a result, the hearing resulted in an unfair

finding of plagiarism. The finding would have been avoided had the Law School followed its stated rules as it was contractually obligated to do. It would also have been avoided had the Law School used its own definition of plagiarism which applied only to finally submitted papers which plaintiff's clearly was not.

6.     The result has been ruinous for plaintiff. The Law School placed a formal reprimand on plaintiff's official Law School transcript and placed, in her official Law School record, a letter stating that she had "plagiarized" her work from other sources. As a result, her high-paying and professionally prestigious employment offer was revoked. Since that occurred, and despite best efforts and her otherwise excellent academic and professional record, plaintiff has been unable to find and maintain employment over the last three years.

7.     Defendants' conduct  amounts to a breach of her contract rights secured under the Law School's Student Handbook, defamation, libel, interference with contract and business advantage, and the wrongful infliction of emotional distress, all of which have caused plaintiff injury and substantial damages in the amounts to be proved at trial.  Harvard should also be ordered to remove all references to this plagiarism finding from plaintiff's Law School record.

## JURISDICTION AND VENUE

8.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §1332(a)(2) (diversity of citizenship) because, as is more specifically shown in paragraphs 9 through 15 below, the plaintiff is a citizen of a different state than are each of the defendants, and the amount in controversy exceeds $75,000.00 exclusive of interests and costs.

9.     Venue is proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to plaintiff's claims occurred within this District.

## PARTIES

10. Plaintiff Megon Walker is a natural person who is domiciled in the state of Ohio.

11. Defendant President and Fellows of Harvard College ("Harvard") is and represents a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business in Cambridge, Massachusetts. Harvard operates the Law School and is responsible for its conduct as described herein.

12. Defendant Ellen Cosgrove is a natural person who is a citizen of the Commonwealth of Massachusetts, and at all times referred to herein she was acting within the course and scope of her employment responsibilities at defendant Harvard and the Law School.

13. Defendant Lloyd Weinreb is a natural person who is a citizen of the Commonwealth of Massachusetts, and at all times referred to herein he was acting within the course and scope of his employment responsibilities at defendant Harvard and the Law School.

14. Defendant Bradley Hamburger is a natural person who is a citizen of the state of California.

15. Lindsay Kitzinger is a natural person who is a citizen of the state of Virginia or Maryland, or the District of Columbia.

## FACTS APPLICABLE TO ALL COUNTS

16. Throughout her entire academic life, plaintiff Megon Walker has been an accomplished student by any measure. Until age 13, she was educated at home by her parents, an education resulting in obvious success because, at the age of 15, she was accepted to and entered Simon's Rock College. She graduated from Rochester Institute of Technology ("RIT") in 2000 with Highest Honors and other academic distinctions, thus earning her Bachelor of Science degree in biotechnology when she was 19 years old. This is the age at which most college

students are just finishing their first year in college. By the time of her graduation from RIT, plaintiff had gained admission to Boston University's graduate school where, after years of rigorous study, she earned her Doctorate in January 2007, a PhD in bioinformatics, having been awarded the GEM Science and Engineering Fellowship.

17. In 2006, plaintiff was accepted to and attended to Harvard Law School, commencing in the fall of 2006 and graduating in the spring of 2009. Plaintiff applied to 16 of America's top law schools and was admitted to 15 of them, including the law schools at Harvard, Yale, and Stanford. Plaintiff was also offered a full scholarship to Columbia Law School. Harvard Law School is consistently ranked and viewed by the public and the legal community as one of the finest law schools in the United States. An acceptance to Harvard Law School is coveted by aspiring lawyers and holds the promise of an excellent legal education by a renowned and accomplished faculty. It also promises the opportunity to successfully compete for the most highly sought-after employment offerings in the legal profession.

18. At the Law School, she pursued her goal of becoming skilled in both technology law and corporate law. From two highly-respected law firms, plaintiff received fellowships, coveted summer associate positions, and entry-level associate attorney employment offers. She impressed the lawyers at the firms for which she worked as a summer law clerk.

19. As a result, in the fall of 2008, while plaintiff was in her third year at the Law School, she received full time offers of employment from both law firms for which she had worked as a summer associate. Both offers entailed a starting salary of $160,000.00, promise of future performance-based raises and bonuses, an excellent health insurance plan, and an opportunity to work in her chosen law practice area with skilled and experienced lawyers to guide and train her. Plaintiff accepted one of those offers.

20. After her professional future was thus well settled with high promise in the fall of 2008, in December of 2008, plaintiff volunteered to write a law article for JOLT, a law journal operated by students at the Law School to publish legal writings (frequently called "law journal articles," "notes," or "case comments") on topical issues relating to science and technology law. Science and technology are constantly evolving, and thus the law governing them must likewise evolve. Our nation's laws evolve sometimes by new statutes enacted by Congress or state legislatures, and sometimes by court decisions interpreting those laws. Journals such as JOLT serve the legal community by analyzing these new legal developments as they may affect the public, science, education and business. This analysis is done by articles written by students or lawyers which are submitted to JOLT for consideration and published if, once finalized in a manner to meet JOLT's standard, they are accepted by JOLT's editorial board.

21. The law article plaintiff chose to write concerned a recent legal decision entitled *In Re Bilski*, 545 F.3d 943, 88 U.S.P.Q.2d 1385 (Fed. Cir. 2008), a highly technical court decision decided by the well-regarded United States Court of Appeals for the Federal Circuit. The *Bilski* decision articulated new law relating to a certain type of patent known as the "process patent." The subject was of interest to the legal community and to plaintiff. Thus she decided to write an article about its potential significance to the relevant practice.

22. Plaintiff was not under any obligation to write this article. Her position at the Law School was secure whether or not she wrote it. During the spring term of her third and last year at the Law School, plaintiff undertook more than the minimum remaining course credits that were required for her to graduate. Likewise, her high-paying and prestigious employment offer was secure. The law article she planned to write was not a requirement for that position nor for graduation that was scheduled just months away.

23. Nonetheless, plaintiff decided to write the article on the *Bilski* case because of her ardent interest in technology law. Always a hard-working student, plaintiff genuinely hoped that she could make a contribution to the field by her thoughts on this new case. To do so, the article needed to have original thinking and be well documented by the legal authorities in the field. Otherwise there was no reason to spend the time researching and writing this article. Well knowing this, she undertook the extra work involved.

24. There is no guarantee that any law article written by a student will be accepted when reviewed by the editors who run JOLT. The process involved is that the student researches the cases, statutes, and other legal writings she deems necessary to fully comprehend the significance of the legal issue involved, here the *Bilski* case. She then prepares an article on the subject for review by the editorial board of JOLT. Such articles, when completed and published in journals such as JOLT, are useful to the legal profession in large measure because as they are written, each assertion or point they make throughout the article normally makes reference to legal authority or precedent that either supports or contradicts the particular assertion or point the author is making. Sometimes these authorities or precedents used by the author are included in quotes made in the text of the article, with the source of the quote stated in a footnote. More frequently, however, a point being made by the author in the text of the article is followed by a footnote and that footnote makes reference to the legal authority supporting or contradicting the point being made in the text, with such authority being either a decision by a court, a state or federal rule or statute, or an earlier writing published by another author. In the completed and finally submitted article, this referencing to other authorities is required so that the author of the article is not plagiarizing an idea or point already stated by some other legal authority.

25. Such referencing is also important because these sources, stated in the footnotes, are

highly valuable to those lawyers, students, or judges reading the article once it is published. By detailed text and footnote references to the important prior legal writings – cases, statutes, or legal commentary by other scholars – the article gives the reader valuable references on the subject involved, thus showing the reader many of the key prior sources in the area of law involved so that the sources can be used by the reader for whatever legal purpose the reader needs. Students reading such law articles use these references in their studies or in law articles they are writing about related subjects. Practicing lawyers use them to better understand the law on which they are advising clients or in legal arguments they are making in their written arguments (called briefs) filed with courts. Courts use them in considering the law involved in cases they are assigned to judge and often use these articles in considering legal arguments or even sometimes in writing legal decisions in cases where they are called upon to decide an issue presented by the parties.

26. Because of the importance of these text and footnoted references contained in any law article written for JOLT or any similar scholarly journal, the better and more plentiful the references the author makes to applicable cases, statutes, and other legal writings, the more useful the resulting law article will be and thus the more widely read and potentially quotable it will become. These references are such a key part to any law article that these articles will frequently have many hundreds of footnotes, each containing one reference and sometimes containing multiple references. They are thus truly the lifeblood and the central value of the law article. As she wrote the law article on the *Bilski* case, plaintiff, fully understanding this, desired her article to have as many useful sources as possible. Not doing so would dilute the worth of the law article she was writing. There was thus absolutely no motivation for plaintiff to hide any legal source she was using in her law article. Therefore, in writing her law article for JOLT on

the *Bilski* decision, plaintiff was highly motivated, as are all law school journal writers, to fully document by plentiful references all of the points she was discussing throughout her law article that had been previously discussed in statutes, by legal scholars, or by judges in case decisions. The more such sources she referenced, the richer, more valuable, and more widely-read her article would become.

27. JOLT is run by an editorial board composed of law students, as is the case with most other law school law journals. That board is primarily responsible for assuring that the articles it publishes have as many of the sources described above and that they are fully documented. The Board is supervised by Editors-in-Chief. During the 2008 – 2009 academic year at the Law School, defendants Hamburger and Kitzinger were the JOLT Editors-in-Chief. Thus they were the two students who ultimately controlled the operation of JOLT, deciding which law articles should be written, which law articles should be accepted for publication, and what work needed to be done -- what edits, corrections, additions, and deletions – should be made to each of the articles once a law article was handed in for JOLT's consideration by a student or legal professional. When any law article was initially submitted to JOLT for possible inclusion in JOLT's publication, it was reviewed by the editorial staff, which made substantial changes as it saw fit: adding and deleting materials, checking and adding to the sources used in the law article, and having the final approval over what articles are accepted and how they were worded ultimately.

28. The JOLT editorial process normally takes several weeks from the time an article is submitted for consideration. A JOLT Line Editor and a JOLT Article Editor are assigned to each draft article that has been submitted. All drafts are subjected to both "subciting" and "tech editing." During subciting, which occurs first, the JOLT Line Editor collects copies of all sources

cited in the article. The process is called a "source pull." Thereafter, designated JOLT members ("subciters") check each footnote and fill out a report form about the footnotes, reporting on whether the author had used the correct format (the so-called Bluebook format) and how well each source supports the article. The JOLT Line Editor corrects the article based on these report forms. During tech editing, that follows the subciting just described, a JOLT Line Editor, an Article Editor and at least one other JOLT editorial board member consider each sentence and footnote in the article. They compare each source to the article text relating to that source, correct mistakes, and note any problems with sentence structure or source attribution about which to alert the author. The author then makes any needed changes during author edits, but no further subciting or tech editing follow author edits. The draft is published after author edits.

29. After JOLT and plaintiff agreed to a student-authored article about the *Bilski* case in December 2008, JOLT indicated that it wanted a first draft from plaintiff on February 1, 2009. Plaintiff had already commenced her work on the draft, writing portions of it, and adding as she learned and read more legal authorities relevant to the article. Plaintiff worked many, many hours on this project, knowing the better written it was and the more sources it referenced, the better it would be received in the legal community.

30. As with virtually all law students at the Law School, plaintiff saved her work on her laptop computer. Virtually all students use such a laptop to perform all their work. Computers are used to take notes in classes and to write papers which are sent to the professors mostly by email rather than in hard-copy. Tests and examinations are taken on laptops. So integral are the laptops to the students' daily life and performance at the Law School that each law student stores work in progress, class notes, and other important matters on their computers. They are an essential part of the life of each law student and are so important that the Law School has set up

and maintains a service center – called the Student and Faculty IT Help Desk (hereinafter "Help Desk") -- where any student or faculty member can bring a computer that is not functioning properly so that it can be fixed and made operational as quickly as possible. When a student's computer is "down" or has "crashed," the colloquial term for malfunctioning computers, the student not only has no access to the work they may need for a class, paper, or test, but they may lose access to such work until the computer is restored. Sometimes such malfunctions actually cause the loss of certain work previously done and stored on the laptop even after the laptop has been fixed.

31. During the days in February before her article was becoming due, it was developing as it should. Plaintiff had spent many days diligently preparing her draft for submission to JOLT. She had spent many hours on the research and writing relating to the draft. As was normal, plaintiff planned to send her article to JOLT by computer, as an attachment to an email.

32. Unfortunately, and through no fault of plaintiff, on February 15, 2009, one week before her draft article was due to be presented to JOLT on February 22, 2009, plaintiff's computer suffered a virus that caused it to malfunction badly. As a result, some of plaintiff's work stored on her laptop was lost, including her most recent work on plaintiff's draft article on the *Bilski* case. The following then occurred, all in 2009:

    (i)        Commencing on February 15 and continuing through February 19, plaintiff's laptop computer, the one on which her work on the *Bilski* article had been stored, was disabled by a virus that forced the hard drive on the computer to reboot without properly shutting down (a so-called "hard" reboot) every few minutes at first and thereafter every few seconds. The laptop computer became dysfunctional. For example, when plaintiff attempted to use the internet browser,

the virus redirected online searches to spam and advertisement websites. Her work stored on it could not be retrieved in the normal manner. This virus had the potential not only to eliminate the work stored on plaintiff's computer, but also to spread from her computer to other computers at the Law School;

(ii)     Plaintiff's computer was therefore quarantined, meaning that it was administratively disconnected by Harvard from the Harvard University Network and that a notification of this quarantine was emailed to plaintiff on February 19, 2009;

(iii)    At plaintiff's request, the Law School's computer Help Desk then attempted to and did retrieve some of the work previously stored on her computer. The virus induced periodic hard reboots with increasing frequency during these attempts. Some of the data retrieved was only "fragmented" sections of work, meaning incomplete portions of work previously stored. Some of the data could not be retrieved at all;

(iv)    After retrieving any data that could be retrieved, scanning that retrieved data for viruses, and storing it on a separate external computer storage drive, the Help Desk attempted to install antivirus software, run a spyware scan, and run a second spyware scan on plaintiff's laptop computer. These attempts failed. Next, the Help Desk completely wiped out everything on plaintiff's computer hard drive so that the virus would be eliminated. This eliminated any possibility that any more of plaintiff's previously stored work could be recovered. The lost data included some portions of her work on the draft article she was preparing for JOLT;

(v)     While the Help Desk attempted to restore her computer and then ultimately wiped

the hard drive, plaintiff informed JOLT editors of her problem. During her efforts to recover from the effects of the virus and the data loss, and during her efforts to restore the draft, plaintiff consistently updated the JOLT Editors about the virus she had suffered and the resulting incomplete nature of her draft. Because plaintiff had attempted and failed to retrieve the most recent versions of the draft and because her prior work would have to be replicated hurriedly from memory before JOLT's February 22 submission deadline, plaintiff repeatedly communicated personally and by email with various JOLT editors about her difficulties and about the incomplete condition of the draft. In making these disclosures to numerous editors, plaintiff complied with a rule in the Law School's Student Handbook: "Students who are in any doubt about the preparation of their work should consult the appropriate instructor, supervisor, or administrator before it is prepared or submitted."

(vi)   In separate face-to-face conversations with JOLT Line Editor Andrew Ungberg on February 24 and with JOLT Submissions Editor Anna Volftsun in March, plaintiff expressed her intention to substantively revise and shorten and proofread the draft, to rewrite sections of the draft, and to reconstruct the proper source credits. Plaintiff expressed the hope that her furnishing of the full-text sources would hasten the source pull by the JOLT Line Editor and Article Editor so that plaintiff could resume her work on the article as soon as possible. Both JOLT Line Editor Andrew Ungberg and JOLT Submissions Editor Anna Volftsun responded by describing how these efforts by plaintiff could be reconciled with JOLT's editorial process. Thus, plaintiff updated the JOLT Editors about her

progress multiple times before, during, and after transmission of her draft and sources and was led to believe that she would have additional time to complete her draft. Moreover, by various emails sent to plaintiff by JOLT Editors-in-Chief both before and after delivery of her uncompleted draft and full-text sources to JOLT, plaintiff was assured by them that she would have time in March 2009 to complete the draft so that it could become final.

(vii)     For some reason never expressed to plaintiff, despite plaintiff's virus and the delay it had caused and despite the assurances of allowing her time to complete her draft, JOLT allotted to the tech edits of plaintiff's draft only 50 percent of the tech edit time that had been allotted to each of the other three student-authored articles JOLT had received for consideration that spring. This was despite the fact that, unlike plaintiff's incomplete draft, those three student-authors had experienced no computer problems and thus had submitted completed drafts;

(viii)    On February 24, JOLT Editors-in-Chief Hamburger and Kitzinger assured plaintiff that she would be allowed to complete the draft in March 2009; they insisted that "we just need to take it as it is now," so that JOLT Article Editor Sarah Spurgeon and JOLT Line Editor Andrew Ungberg could begin their designated tasks of producing full-text sources corresponding to the footnotes of plaintiff's draft and preparing for subsequent editing sessions. Accordingly, plaintiff sent the draft (previously explained to be unfinished because of the computer virus) by email to the JOLT Article Editor Sarah Spurgeon and Line Editor Andrew Ungberg on February 24. The text of this email read in part "Here's the latest draft of the Bilski piece. Sorry about the delay. Let me know if

you have difficulty finding any sources." Just after plaintiff sent this incomplete draft by email, she went to a required class. Immediately thereafter, plaintiff hand-delivered full-text source materials and her draft to JOLT Line Editor Andrew Ungberg at the JOLT office via a flash drive. Such a physical delivery of these sources, instead of a computer transfer, was required because these two source document files contained so many sources that they were too large to send by email. When delivering all these sources, plaintiff told JOLT Line Editor Andrew Ungberg about the unfinished condition of the draft and the reasons for it, just as she had previously told other JOLT Editors. Plaintiff also told Andrew Ungberg that she planned to substantively revise and shorten and proofread the draft, to rewrite sections of the draft, and to reconstruct the proper source credits. JOLT Line Editor Andrew Ungberg responded by telling plaintiff that he preferred to incorporate revisions as soon as possible and encouraged plaintiff to inform the JOLT Article Editor Sarah Spurgeon of the draft's incomplete and fragmented condition.

(ix)     On February 27, in a follow-up email with JOLT Line Editor Andrew Ungberg and Article Editor Sarah Spurgeon, plaintiff confirmed the incomplete nature of the draft and requested further opportunity to complete it. This request was forwarded to the JOLT Editors-in-Chief, defendants Hamburger and Kitzinger. Kitzinger again promised plaintiff that she would be allowed to make changes in March 2009;

(x)      It was thus understood by JOLT that the draft article plaintiff delivered simply had not been delivered as a final submission, and that plaintiff had neither

intended it as such nor represented it as such;

(xi)     Because the draft was obviously unfinished, on February 24, JOLT Article Editor
         Sarah Spurgeon volunteered to begin substantive edits of plaintiff's draft in order
         to assist plaintiff with its completion. Yet Kitzinger refused to allow it. On
         February 26, Kitzinger told JOLT Article Editor Sarah Spurgeon to exclude
         plaintiff from working on gathering the sources needed to complete the article or
         to otherwise work on it at all, even though this ran contrary to JOLT policy of
         allowing student-author participation in such work and even though plaintiff had
         repeatedly requested to help complete her draft. On February 27, JOLT Article
         Editor Sarah Spurgeon again indicated by email to Hamburger and Kitzinger that
         she wanted to commence substantive editing of plaintiff's draft. Again Kitzinger
         refused to allow any such work to be done;

(xii)    In mid-March 2009, plaintiff again, along with JOLT Submissions Editor Anna
         Volftsun, volunteered to defendants Hamburger and Katzinger to assist with the
         technical editing, substantive revisions, and corrections of plaintiff's draft which
         were obviously still needed. Editors-in-Chief Hamburger and Kitzinger responded
         to plaintiff with an email inviting her to meet them in the JOLT office for a
         discussion of her draft.  Hamburger directed the JOLT Submissions Editor Anna
         Volftsun by GChat to stop communicating with plaintiff about the draft. In mid-
         March 2009, extra JOLT tech edit time was scheduled for a student author whose
         article had already been allotted twice as much tech edit time as plaintiff's draft
         had been afforded;

(xiii)   On March 12 and 14, 2009,  defendants Hamburger and Kitzinger emailed to

                                              17

other JOLT Editors that "there just isn't time to have Megon fix the problems, since we can't go back and do another round of subciting and tech edits." They also emailed that they hoped plaintiff would just let the work on her draft article "drop" rather then pressing to have it finished, and that "we think it's important that the journal come out of this situation looking like it addressed the situation and did so properly." During their decision to pull plaintiff's draft from the editorial process, Hamburger and Kitzinger enlisted JOLT Executive Editor Gwen Hochmen for "back up" to support their decision even though she had not personally reviewed plaintiff's draft;

(xiv)   Thereafter, during the face-to-face meeting in the JOLT office to which they had invited plaintiff, defendants Hamburger and Kitzinger informed plaintiff that her draft would be pulled from the editing process and that her draft was going to be reported to defendant Cosgrove of the Administrative Board (the Law School's student disciplinary committee) as having been plagiarized;

(xv)    Defendants Hamburger and Kitzinger then in fact reported plaintiff's law article draft to the Administrative Board as a "final draft" containing plagiarism. However, in so doing, they only sent the Administrative Board the fragmented article recovered from the computer. Moreover, they did not at this time send or mention to the Administrative Board the full-text source materials that plaintiff had given to JOLT. Instead of referring to these sources that plaintiff had turned in, Kitzinger and Hamburger falsely indicated to Cosgrove that they had been required to use Google searches to find plaintiff's source material, as if plaintiff had not provided full-text sources. Kitzinger and Hamburger also did not mention

to defendant Cosgrove any of the following significant and mitigating facts: (a) the computer virus and the resulting data loss, (b) plaintiff's disclosures to and many consultations with the JOLT editorial board about the draft's condition made by plaintiff before and during and after plaintiff's delivery of the fragmented draft along with full-text source material, (c) the numerous requests from plaintiff and the JOLT Submissions Editor and the Article Editor to make substantive changes to the draft as soon as possible, (d) the allotment to plaintiff's draft of half the tech edit time allotted by JOLT to every other student-authored article, or (e) JOLT's repeated assurances, later retracted, that plaintiff would be allowed to finish the draft in March 2009. Their allegations concluded "...so if the piece had survived the subcite and tech edit process without this problem being discovered, it is highly possible that the [sic] Megon's comment could have made it into the published journal." Hamburger and Kitzinger did not acknowledge to the Administrative Board that plaintiff took great pains to prevent the draft from being published in its fragmented, incomplete state.

33. Because of this completely unwarranted plagiarism referral, the Administrative Board held a hearing which was required by the Student Handbook to be held under the rules set forth in the Handbook for doing so. However, as shown in more detail further below, this hearing was not held in accordance with the rules Harvard had set up for holding such a hearing and plaintiff was denied certain of the key rights set forth in those rules. As a result, she was found guilty of plagiarism and a formal reprimand letter was placed in plaintiff's permanent record at the Law School and was noted in writing on her permanent Law School transcript. She thereafter filed all appropriate appeals allowed under Harvard's rules, but those did not result in any serious review

of what had happened and were themselves not conducted as required by the rules. The reprimand was allowed to stand, permanently.

34. The plagiarism reprimand was not true and not fair. Plaintiff had not submitted a work that was anywhere near final. It was simply nowhere near final enough in shape that it could be considered as a submission for any purpose, much less for the purpose of determining whether or not plaintiff had given full and complete credit to all those legal sources which she had used in her article. Nothing about her draft was complete, and that included source credits. Since they were not complete, and this was well known to everyone involved, it was completely unfair to treat her draft as a final submission and hold it to the standard applicable to final work.

35. Plagiarism, which is a form of academic dishonesty, is a very serious matter. It brands the student involved as dishonest and untrustworthy, two of the greatest risks any prospective employer can run when contemplating the hiring of a young lawyer or law school graduate. The practice of law depends at its essence on trustworthiness. Clients, lawyers, and judges routinely rely on the character of lawyers for trustworthiness in virtually every aspect of the practice of law. Clients rely on honest billing by lawyers for services, as well as for truthful statements about past experiences of the lawyer on which a client will base a decision about whether or not to hire the attorney, for accurate assessments of the likelihood of success in a particular case, and for accurate reporting about what is occurring in a case on which the lawyer represents the client. Lawyers rely on each other to tell the truth in their professional dealings with each other, whether they are working together or as adversaries on a case or transaction. Judges count, day in and day out, on lawyer honesty as they sit on the bench and listen to lawyers tell them about the facts of the case or about prior decisions that relate to the matter the judge is deciding. These judges count on lawyer honesty in every proceeding over which they preside.

36. Equally, in the large law firms of the kind to which plaintiff had been accepted before she was falsely branded as academically dishonest, senior lawyers at the firm likewise count on the honesty of the younger lawyers, such as plaintiff would have been had she entered such a law firm after graduation. On a daily basis, younger lawyers in these firms research cases, look through documents or interview witnesses to ascertain facts, and then report what they have learned to the senior lawyers. These senior lawyers must have complete confidence that they are being told the truth. While junior lawyers can and often do make mistakes based on lack of experience in reading the law or understanding the facts, and thus do not always fully or accurately report the matters at issue to their seniors, such mistakes are expected and can be corrected with training. However, if a young lawyer is seen as dishonest, then nothing he or she says will be deemed trustworthy. He or she will have no utility within the firm and will certainly not be worth the time and cost involved in training. Therefore, when the Law School branded plaintiff as academically dishonest, it destroyed what had theretofore been her promising career by branding her as dishonest, a brand having all of the adverse professional effects just described.

37. Since receiving the reprimand for plagiarism, plaintiff has disclosed it to all concerned, with damaging consequences. To begin with, the high-paying and prestigious job offer she had already obtained in the fall of 2008, referred to above, was withdrawn. Since then, plaintiff has (with one exception discussed below) been turned down at every job for which she has applied. Should a firm initially express high interest in her as an employee, the firm declines to hire her when plaintiff discloses the reprimand. Each time a firm invites plaintiff to interview, or expresses great interest in her as a prospective employee, her employment application is declined when plaintiff discloses the reprimand. On just one occasion she received a job offer

from a highly regarded firm with a national reputation for excellence, even though she had informed a law firm interviewer of the reprimand. Three months after she started work at this law firm, certain senior lawyers at the firm discovered from her employment file that she had been reprimanded and induced plaintiff to resign in lieu of being fired because of it.

38. Since that one brief period of employment, plaintiff has been unable to obtain any employment offer. Without the reprimand, plaintiff would be a very readily employable lawyer given that she has passed the Texas state bar examination and the federal patent bar examination and thus is qualified to practice law immediately, and because of her exemplary academic record earned over her many years of impressive academic performance. Without the reprimand on her record, plaintiff would have been employed since finishing law school in 2009, and she would have earned at least five hundred thousand dollars in salary by the date of this complaint, May 2012. She would also be employed now and be earning a high-paying salary on an ongoing basis. Plaintiff's search for employment is further hampered by the rescinded offer from one law firm and by the abbreviated three month long stint at another law firm – both of which are directly attributable to the reprimand. Further, the reprimand delayed plaintiff's admission to the Texas and federal patent bars.

39. Plaintiff's inability to obtain employment offers has been caused directly by the plagiarism reprimand. Before the reprimand, she had received two offers from highly-respected firms. After the reprimand, the employment offer that plaintiff had accepted in 2009 was rescinded. After the reprimand, the firm referred to in paragraph 37 hired her initially based on her excellent record, but terminated her employment after those in authority at the firm found out that she had disclosed the plagiarism finding.

40. The Law School's ruinous plagiarism reprimand was not warranted. It is not true. Plaintiff did not plagiarize. Under the Law School definition of plagiarism and academic

dishonesty generally, such conduct is forbidden when any work is submitted. But as plaintiff made clear when she delivered her draft to JOLT, it was an incomplete and fragmented version of a draft that had been corrupted and made incomplete by a virus on her computer. Plaintiff consulted with the JOLT editorial board throughout her preparation of the draft, as the virus compromised her laptop, and as data was therefore lost. Before and after delivery of the draft and the full-text sources to JOLT, plaintiff received repeated assurances from the JOLT Editors-in-Chief that she would be allowed to complete the draft in March 2009. This was therefore not at all a submission of a completed article improperly using the work or thoughts of others without giving them credit. Plaintiff did not and could not have made such a submission given the corrupted and fragmented state of the draft she delivered to JOLT -- a draft accompanied by full-text sources and plaintiff's clear explanation of the draft's fragmented and incomplete nature. It simply was not a final submission, as she had repeatedly explained. Plaintiff thus had never held this draft out as a final submission and such submissions are the only kind that can be reviewed for plagiarism under the applicable Law School rules. Plaintiff therefore simply did not commit plagiarism as defined by the Student Handbook, the only source specifying conduct for which students can be punished and defining punishable conduct. Those definitions inform students about what is prohibited and what is not.

## COUNT I

### (First Breach of Contract by Defendant Harvard)

41. Plaintiff hereby realleges and incorporates herein all the allegations contained in the foregoing paragraphs of this Complaint as if fully set out herein.

42. Defendant Harvard had, as of the dates referred to in this Complaint, adopted rules and regulations regarding conduct of law students attending the Law School, specifying how law students

should conduct themselves. These rules and regulations were known as and called the "Handbook of

Academic Policies/ Rules Relating to Law School Studies" (hereinafter the "Student Handbook"). The

Student Handbook was published by the Law School in catalogue form and on its website so that all law

students would have easy access to these rules. These rules specified the required conduct expected of the

students so that the students could be fully informed as to what they could and could not do in relation to

their conduct as law students. The Student Handbook also stated how disciplinary action against any

accused law student should be taken, and what rights any law student should have if they were accused of

any conduct forbidden by the rules stated in the Student Handbook.

43. The Student Handbook, stating the rules and regulations concerning how law students should

conduct themselves, informed the law students concerning their required conduct and how disciplinary

proceedings would be conducted. The Student Handbook was a contract between the law students and

the Law School. By entering the Law School and matriculating into the Law School, plaintiff, like all law

students, became contractually obligated to follow the rules and regulations set forth in the Student

Handbook. Likewise, the Law School, operating for defendant Harvard at all times referred to herein, was

contractually bound to honor the rules and regulations stated in the Student Handbook. Specifically, the

Law School was contractually bound to the students as follows. Academic and related conduct defined in

the Handbook as prohibited was prohibited and would be the subject of punishment, and conduct that was

not prohibited would not be punished. Plaintiff was contractually entitled to be punished only for such

conduct as was proscribed by the Handbook and, when accused of such conduct, any hearing on that

accusation was also contractually obligated to occur substantially in the manner promised in the

Handbook.

44. One of the most serious and clearly defined courses of conduct forbidden in the Student

Handbook, at Article V thereof, was "Academic Dishonesty" by plagiarism, defined as follows:

All work submitted by a student for any academic or nonacademic exercise is expected to be the student's own work. In the preparation of their own work, students should always take great care to distinguish their own ideas and knowledge from information derived from sources.

45.   The uncompleted and fragmented draft delivered by plaintiff to JOLT, with all the written and oral explanations of the virus causing its unfinished state, was simply not a "submitted" work as defined by the above-quoted rule in the Student Handbook. The plain meaning of the word "submitted" is "to yield or surrender to the will of another." In legal terms, when a pleading or brief is "submitted" this means that it is finished and completed, left to the judge to be considered without further changes or additions. This is plainly not what occurred when the fragmented and incomplete draft was delivered to JOLT by plaintiff. It was delivered with the explanation that it was not completed, needed much work, and had been fragmented. Thus, the draft was not turned over as a final or completed document for surrender to others for consideration in its current form. Rather, plaintiff described the draft as one that was not possibly "submitted" and could not fairly have been considered as such, because it was clearly a draft that required much additional work, as was well known to defendants Hamburger and Kitzinger as well as by other JOLT Editors. By charging plaintiff with "submitting" a plagiarized article, defendant Harvard breached its contract with plaintiff by disregarding the meaning of "submitted" – the term defendant Harvard itself had chosen for use in its Student Handbook -- thus charging plaintiff with submitting a plagiarized work when what she delivered was not "submitted," as that that term is defined, and it was thus  not an attempt to take credit for the work, ideas, or knowledge of others.

46.  This breach of contract caused plaintiff injury, damage, and loss of income all in the manner and to the extent as will be shown at trial.

## COUNT II:

### (Second Breach of Contract by Defendant Harvard)

47.  Plaintiff  hereby realleges and incorporates herein all the allegations contained in the

foregoing paragraphs of this Complaint as if fully set out herein.

48. In the Student Handbook, Harvard promised each law student that it would follow certain procedures if ever that student was charged with conduct forbidden by the Student Handbook. The Student Handbook provided that if ever a student was subject to a serious charge, such as plagiarism, that charge would be heard and considered by a group of faculty, administrators, and students called the Administrative Board. At such Administrative Board hearings, the Student Handbook promised the students that (1) such hearing would be non-adversarial, (2) it would be concluded in the manner most favorable to the student whose conduct was being examined in light of the circumstances, (3) the student whose conduct was under examination would have the right to cross-examine any witness at the hearing who had offered evidence against that student, (4) and no student would be sanctioned unless the charged infraction is established by clear and convincing evidence. Each of these promises was part of the contract obligation embodied in the Student Handbook and thus Harvard was contractually obligated to substantially comply with each of these obligations to each law student.

49. However, when the Administrative Board held the hearing on the charge that plaintiff had plagiarized her uncompleted and fragmented draft, none of the four just-referenced contractual obligations were honored as agreed.

50. First, Administrative Board chairperson Lloyd Weinreb conducted the hearing, held on May 7, 2009, in an adversarial manner throughout. Weinreb halted plaintiff's representatives' cross-examination of Kitzinger and Hamburger despite the handbook promise allowing that cross-examination. Defendant Weinreb also allowed Kitzinger and Hamburger to confer with each other by whispering before answering individual questions put to them, even though plaintiff and her representatives protested several times that this was collusive and unfair. On

several occasions, Weinreb disallowed plaintiff's representatives from speaking on her behalf; instead Weinreb insisted that plaintiff speak for herself despite the fact that the Student Handbook promised her that she could have representatives speak for her. By these and other actions, Weinreb set an adversarial tone for the hearing in direct disregard of the Handbook's promise that the proceeding would not be confrontational. In further violation of the Student Handbook's contractual promises to plaintiff, defendant Cosgrove also failed to act as an impartial liaison between the Administrative Board and plaintiff. Cosgrove was consistently hostile to plaintiff and plaintiff's representatives, rebuffing every attempt at an informal resolution that would avoid an Administrative Board hearing. Cosgrove refused to conduct discovery into the internal JOLT emails until plaintiff's representation appealed to Weinreb for such records. Later, Cosgrove supported Hamburger and Kitzinger when they cited the demands of final examinations and papers in a refusal to cooperate with discovery requests, but Cosgrove refused to grant plaintiff extensions on her other academic work so that she could prepare for the hearing. At the hearing, while extending no assistance or guidance to plaintiff, Cosgrove verbally coached Kitzinger and Hamburger about their testimony minutes prior to their appearance before the Administrative Board. Such coaching was all the more a violation of plaintiff's rights because Cosgrove herself thereafter voted on plaintiff's guilt or innocence as one of the three administrators appointed to sit on the Administrative Board.

51. Second, Weinreb failed, despite the explicit promise to do so contained in the Handbook, to resolve the hearing in the manner most favorable to plaintiff and in fact stretched the facts and the evidence in such a way that the hearing was resolved much less favorably to plaintiff than it should have been. Specifically, he deemed "submitted" the plaintiff's uncompleted, virus-impaired draft, which had not been finally submitted under any reasonable

definition of that term. Weinreb thus held plaintiff to the same standard with respect to source crediting as if plaintiff had represented to the JOLT Editors that her law article was being surrendered to them as a final submission for editorial treatment, when in truth and in fact plaintiff had repeatedly explained that much work was still needed because of the virus, that the draft was by no means completed, and that she herself desired to, and asked many times to, do more work to complete her article. Weinreb engaged in additional unfair conduct that clearly breached Harvard's obligation to consider matters in the light most favorable to the plaintiff.

52. Third, Weinreb repeatedly prevented plaintiff's properly-appointed representatives from cross-examining Kitzinger and Hamburger, again dishonoring the Handbook's assurance of such opportunity. Weinreb stopped the cross-examination when plaintiff's representatives attempted to show by cross-examination of defendant Kitzinger that defendant Editors-in-Chief Kitzinger and Hamburger had lost or destroyed the full-text source materials given to JOLT by plaintiff. Weinreb stopped the cross-examination when plaintiff's representatives attempted to inquire about Kitzinger's and Hamburger's failure to disclose to the Administrative Board for over a month that plaintiff had indeed provided JOLT with full-text sources along with the draft. Thus Weinreb prevented questioning on the key facts about whether plaintiff had provided sources or not. This not only violated Harvard's promise to allow cross-examination, but also violated its promise to consider the facts in the light most favorable to plaintiff. Indeed, instead of doing so, he specifically cut off the questioning that would have established those facts.

53. Fourth, the Administrative Board was presented with nothing approaching clear and convincing evidence. A draft delivered to a student publication in the form of plaintiff's draft and with plaintiff's explanations could never have been considered "submitted" for the purposes of a plagiarism charge.

54. The acts and omissions of the Administrative Board described above were a breach of the contractual promises described in the Student Handbook and they resulted in an unfair finding that plaintiff had submitted a plagiarized law article when she had in fact not done so.

55. This breach of contract caused plaintiff injury, damage, and loss of income all in the manner and to the extent as will be shown at trial.

## COUNT III

### (Interference with Contract and Business Advantage by Defendants Hamburger and Kitzinger)

56. Plaintiff hereby realleges and incorporates herein all the allegations contained in foregoing paragraphs of this Complaint as if fully set out herein.

57. Plaintiff had valuable contract rights found in the Student Handbook which have been alleged in detail above. Defendants Hamburger and Kitzinger well knew of those rights.

58. By their actions described above, defendants Hamburger and Kitzinger intentionally and without just cause induced the Law School personnel responsible for honoring those rights to breach them, thus denying plaintiff her valuable rights that had been promised to her.

59. The plagiarism charges were wrongful and unfounded. They were brought in a manner designed not to secure the valuable goal of academic honesty, which plaintiff herself has followed and supported her entire academic life. Rather they were brought by defendants Hamburger and Kitzinger and others for improper purposes: to cover up their own unwillingness to have themselves and other JOLT editors put in the time and work to finish plaintiff's draft and to cover up their own unwillingness to allow the plaintiff to put in extra the time and work to finish her own draft, which would in turn cause more and delayed work for others on the staff and for themselves. Indeed, the charge of plagiarism was maliciously brought in bad faith by these defendants for the explicitly-stated but completely improper purpose of making the JOLT

Editorial Board "come out of this situation looking like it addressed the situation and did so properly," as Hamburger and Kitzinger wrote in their own words. First, they refused to allow her the same amount of tech edit time as was allotted to the other student authors, even though those student authors had not encountered the computer virus suffered by plaintiff and thus needed less, not more time, than plaintiff. Indeed, the defendants only allotted plaintiff 50% of the time they allotted each of the other student authors. In mid-March 2009, extra tech edit time was scheduled for a student author who had already been allotted twice as much tech edit time as plaintiff had been afforded. Moreover, despite plaintiff's repeated offers to help bring her draft to completion and despite the offer of the very able JOLT Submissions Editor to help plaintiff do so and despite the JOLT Article Editor's February 27, 2009 email to the Editors-in-Chief indicating that she preferred not to postpone substantive editing of plaintiff's draft until later in the spring and despite all the work the draft obviously required before it could be submitted, defendants Hamburger and Kitzinger instructed the JOLT staff to exclude plaintiff and JOLT Submissions Editor Anna Volftsun from helping to resurrect the draft. (The written allegations brought by Hamburger and Kitzinger in March 2009 did not mention the systematic exclusion of plaintiff and JOLT Submissions Editor Anna Volftsun from JOLT's editorial processing of plaintiff's draft. Plaintiff's representatives inquired of Hamburger and Kitzinger twice through Cosgrove. On April 1, 2009, Hamburger and Kitzinger told Cosgrove that nobody had inquired about plaintiff's draft. On April 22, only after a second prompting by plaintiff's lawyers, Hamburger and Kitzinger finally admitted to Cosgrove that JOLT Submissions Editor Anna Volftsun had inquired about the draft on plaintiff's behalf.) Even worse, while plaintiff had physically delivered to JOLT the full-text of sources relied upon in her draft article, these defendants, Hamburger and Kitzinger, or persons under their control, actually lost or destroyed those sources

without admitting the loss or destruction to the Administrative Board for over a month after allegations were brought against plaintiff. Some of these very sources they later claimed plaintiff had not credited and they claimed to have found some sources using Google searches. Indeed when plaintiff's counsel attempted to cross-examine defendant Kitzinger about the highly significant fact of plaintiff's provision to JOLT of the draft with the full-text sources, defendant Weinreb stopped the cross-examination just as defendant Kitzinger began to cry. This "tearing up" on the highly central matter prevented a full airing of the bad faith that occurred in the context of the making of the plagiarism charge by defendants Hamburger and Kitzinger and, by the unfair manner in which defendant Weinreb allowed the Administrative Board hearing to proceed, it was not possible for the hearing to be resolved in the manner most favorable to plaintiff in the circumstances. Weinreb barred from consideration, indeed from questioning, about facts at the heart of the matter. When they alleged plagiarism to Cosgrove in March 2009, defendants Hamburger and Kitzinger omitted to mention how plaintiff consulted with JOLT about the unfinished condition of her draft following a laptop computer virus and quarantine from the Harvard Network.

60. At the time defendants acted in the manner described above, they well knew that they were interfering with plaintiff's contract rights as secured by the Student Handbook and that plaintiff had earned and had the promise of enjoyment of many valuable and professionally advantageous relations within the legal community. They were fully aware that a reprimand for plagiarism would destroy those relations.

61. The conduct described above was the clear use of improper motives and means to accomplish the interference by these defendants with plaintiff's contract rights secured by the Student Handbook and advantageous relations secured by plaintiff in the professional

community.

62. This interference with contract rights and advantageous business relations and prospective business advantage caused plaintiff injury, damage, and loss of income all in the manner and to the extent as will be shown at trial.

## COUNT: IV

### (Defamation and Libel by all Defendants)

63. Plaintiff realleges and incorporates herein all the allegations contained in the foregoing paragraphs of this Complaint as if fully set out herein.

64. In plaintiff's permanent law school transcript, a document that will stand forever unless ordered removed by this Court, as a measure of plaintiff's performance and conduct at the Law School, defendant Harvard has published the following statements:

> The student [referring to plaintiff] was issued a letter of Reprimand by the Administrative Board on May 7, 2009. This letter is on file in the Office of the Registrar.

The letter on file, dated May 7, 2009 and referred to above, states as follows:

**Letter of Reprimand:**

As you know, the editors of the Journal of Law and Technology raised a concern about possible plagiarism in your draft article submitted to the editors of the journal.

Once notified, the Administrative Board investigated the matter and conducted a hearing where you were represented by counsel. The Board determined that you did, in fact, submit a draft article which plagiarized from other sources. The Board therefore determined that the appropriate sanction in such a case was to issue an official letter of reprimand which will remain part of your permanent file at Harvard Law School.

This letter will be disclosed to the Massachusetts Bar and any subsequent Bars to which you petition for admission. The Law School will also have to disclose it as part of any background checks where you authorize information to be released from the Law School. The reprimand will be noted on your official law school transcript as well.

65. The statements quoted above are false in that they state that plaintiff "plagiarized from other sources." They are highly injurious and damaging to plaintiff's reputation in that they impugn and denigrate her character for honesty and trustworthiness within the very community where that reputation is the most important to her professionally.

66. By knowingly and intentionally communicating and publishing the above-referenced false statements, defendants have defamed and libeled plaintiff.

67. By doing so in the manner described in this complaint, by distorting the meaning of the word "submitted," by referring her to the Administrative Board for plagiarism because "we think it's important that the journal come out of this situation looking like it addressed the situation and did so properly" (as stated by defendant Editors-in-Chief Hamburger and Kitzinger in a March 14, 2009 email) , by losing or destroying the full-text sources provided by plaintiff and not admitting this loss or destruction to the Administrative Board until over a month after alleging plagiarism, by refusing to credit her requests for more tech edit time after allotting at least twice as much tech edit time to other student authors, and by other actions, defendants' defamation and libel was published in bad faith, knowing their statements were not true or with reckless disregard of their truth or falsity, and made with malice to plaintiff. This conduct described above caused plaintiff injury, damage, and loss of income all in the manner and to the extent as will be shown at trial.

## COUNT V:

### (Negligent Infliction of Emotional Distress by all Defendants)

68. Plaintiff hereby realleges and incorporates herein all allegations contained in the foregoing paragraphs of this complaint as if fully set forth herein.

69. Defendants conduct as described above  caused and continues to cause serious and injurious

emotional distress to plaintiff. Plaintiff has worked her entire academic life to achieve academic excellence,

sacrificing two full decades to the singular and honorable pursuit of a distinguished academic record such as

would allow her the honors that came with that and the easy employability it would make available in the

highly competitive field in which she sought to pursue her professional life.

70. All of this effort and achievement became the core of plaintiff's life and her identity. It is what

she had constantly sought and justifiably earned. By the unfair and unlawful manner by which all of the

defendants have completely ruined the hard-earned accomplishments of plaintiff, they have caused her

painful, extreme, and continuing emotional distress. This conduct caused plaintiff to lose the opportunity to

publish. In order to prepare for the Administrative Board hearing while minimizing her legal bills, plaintiff

reduced the time she normally would have devoted to class work and papers and final examinations.

Hostile Cosgrove refused to grant plaintiff any extensions on papers and exams even though Cosgrove

shielded Hamburger and Kitzinger from discovery production at exam time. This conduct caused plaintiff

to expend more than $30,000 on legal representatives for the Administrative Board hearing (some of

which was debt incurred by plaintiff). The process of preparing for the hearing was prolonged and

exacerbated when the JOLT Editors and Cosgrove balked at plaintiff's discovery requests. This conduct

caused plaintiff to disrupt her eating and sleeping habits to the extent that she graduated from the Law

School borderline underweight (as assessed by a nutritionist at Harvard Health Services) and emotionally

distraught. This conduct caused plaintiff to forfeit the July 2009 New York and Massachusetts legal bar

examinations in favor of resuming plaintiff's search for law firm employment and in favor of multiple

appeals to Harvard challenging the reprimand within the time allowed. After a law firm rescinded her

employment offer, the $30,000 stipend (including a $10,000 advance) and reimbursement for bar exam-

related and health care expenses paid to other new graduates (whose employment offers had not been

rescinded by that law firm) were denied to plaintiff on the grounds of the reprimand. Each rejection of her

appeals caused plaintiff more mental distress. The reprimand delayed plaintiff's admission to the Texas and federal patent bars.

71. The effect on plaintiff was severe emotional distress of the kind that no reasonable person could be expected to endure. By the false allegation of plagiarism resulting in unfair branding of plaintiff as a cheat and as academically dishonest, defendants have destroyed everything plaintiff has worked and sacrificed to achieve, and plaintiff is left daily with that shame, no job, alone with only the knowledge that unless she has relief from this Court, she will never obtain what she has worked so hard to achieve and what she deserves. Each time she arrives at a new job interview, she faces the humiliation of the awareness following her disclosure that she was found to have been academically dishonest. The effects, daily, are a combination of embarrassment, shame, anger, helplessness, worry about her future, and frustration of the present unfairly imposed obstacle to obtaining a place in the workforce.

72. This conduct described above caused plaintiff injury, damage, and loss of income all in the manner and to the extent as will be shown at trial.

## COUNT VI:

### (Irreparable Injury to Plaintiff by Defendant Harvard)

73. Plaintiff hereby realleges and incorporates herein all allegations contained in the foregoing paragraphs of this complaint as if fully set forth herein.

74. The reprimand letter contained in plaintiff's Law School file and the reprimand noted on her Law School transcript are highly damaging. They have and will continue to cost plaintiff many hundreds of thousands of dollars in salary for the reasons explained above. Moreover, they have and will continue to cause plaintiff harm of a kind that cannot be fully compensated by money damages alone. The continuing presence of this reprimand forces plaintiff to disclose it to

anyone from whom she seeks work or to anyone she wishes to consider her academic performance for any reason. It is a stain on her reputation of the worst kind. Knowledge of its existence, when it becomes know to those to whom it is disclosed by plaintiff or otherwise, is likely spread to others in the legal community. The injury and damage from the presence of this cannot be fully or adequately measured or compensated for by money damages alone. It is wrongfully present at the center of her record for all the reasons stated in this Complaint and unless removed by order of this Court, will continue to stain plaintiff's record and thus cause continuing irreparable harm.

75. The reprimand should thus be ordered removed from plaintiff's transcript and her record.

### RELIEF

WHEREFORE PLAINTIFF hereby respectfully requests that this Honorable Court:

A.    That defendant Harvard be enjoined and ordered to permanently remove from all parts of plaintiff's record under its control all references to the reprimand or the finding of plagiarism;

B.    That all defendants pay to plaintiff the money damages proved at trial;

C.    That defendants pay fees and costs of this proceeding as allowed by law; and

D.    That this Court enter such other and further relief as this Court deems just.

Dated: May 4, 2012

RESPECTFULLY SUBMITTED

MARKHAM & READ
John J.E. Markham, II
John J.E. Markham, II
(BBO No. 638579)
One Commercial Wharf West
Boston, Massachusetts 02110

Tel;  (617) 523-6329
Fax: (617) 742-8604
Email: jmarkham@markhamread.com