UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MEGON WALKER,

        Plaintiff,

  v.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, et al.,

        Defendants.

Case No. 1:12-cv-10811-RWZ

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**FACTS**

    The plaintiff Megon Walker attended Harvard Law School ("HLS") from 2006 to 2009. Defendants' Statement of Undisputed Material Facts ("Facts") ¶ 1. During all three years of law school, Walker worked on the Journal of Law and Technology ("JOLT"), a student-run journal at HLS. *Id.* ¶ 10. Walker was involved with JOLT in a variety of positions and became familiar with its practices for editing and publishing articles. *Id.* ¶¶ 10-14. In Walker's third year of law school, JOLT accepted her application to write a comment about a patent case, *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008), for publication in the journal that spring. *Id.* ¶ 15.

    HLS has a Handbook of Academic Policies (the "Handbook"), which Walker received upon enrolling. *Id.* ¶ 5. The Handbook contains a section concerning "Preparation of Papers and Other Work – Plagiarism and Collaboration." *Id.* ¶ 7. It strictly prohibits students from submitting any work that is not their own without proper attribution, even if inadvertently:

> All work submitted by a student for any academic or nonacademic exercise is expected to be the student's own work.  In the preparation of their work, students should always take great care to distinguish their own ideas and knowledge from information derived from sources. … Students who submit work that is not their own without clear attribution of all sources, even if inadvertently, will be subject to disciplinary action.

*Id.* ¶ 8.  Walker concedes that this rule applied to the case comment – including all drafts of the comment – that she turned in to JOLT.  *Id.* ¶ 9.

Walker delivered a first draft of her comment to JOLT on February 2, 2009, a second draft on February 8, 2009, and a third draft on February 16, 2009 – one day after her laptop computer was infected by a virus.  *Id.* ¶¶ 23, 28, 30, 32.  The email with which Walker delivered her third draft said nothing about the virus causing her to lose any citations or other work on her draft, or about causing her draft to be "fragmented" or "incomplete."  *Id.* ¶ 33.

Walker submitted her fourth and final draft on February 24, 2009.  *Id.* ¶¶ 34-35.  Walker understood that this final draft needed to contain citations to all of her sources because this draft would go directly into the "sub-cite" process, in which JOLT staff carefully check the accuracy and completeness of each citation.  *Id.* ¶ 36.  Walker was familiar with the sub-cite process, as she worked as a sub-citer for JOLT during her first year at HLS.  *Id.* ¶ 11.  Walker understood that after the sub-cite process, the editorial staff would make further edits to her piece, after which – at the end of March – she would be permitted to make final "author edits."  *Id.* ¶ 37-38.  Walker understood that these author edits could include minor changes but not significant additions to either the text or footnotes.  *Id.* ¶ 39.  Walker understood that she would not be able to make any changes to her comment between her submission of the final draft in late February and the time for author edits at the end of March.  *Id.* ¶ 40.

On February 24, 2009, when Walker was about to send in her final draft, she sent an email to the JOLT editors, which said, "ok, [I'm] sending it out now. *All the sources are included*, but I'm still moving words around[.]" *Id.* ¶ 44. (emphasis added). Shortly thereafter, when she sent the final draft, her cover email said, "Here's the latest draft …. *Let me know if you have difficulty finding any sources,*" *id.* ¶ 45 (emphasis added), which the editors naturally understood to mean any difficulty finding "the sources cited in her piece." *Id.* ¶ 46. Neither email said that the draft had been impacted by the computer virus, was "fragmented" or "incomplete," was missing citations, or otherwise was not ready to go into the sub-cite process. *Id.* ¶ 47.[1] Nor did the draft on its face appear to be "fragmented" or "incomplete." *Id.* ¶ 48.

Later that day Walker met with Andrew Ungberg, the line editor for her piece. *Id.* ¶ 51. Walker gave Ungberg two electronic files, which contained Westlaw versions of all her sources. *Id.* ¶ 52. Walker claims she told Ungberg that, as a result of the computer virus, she needed to do more work on the article including checking the citations and quotations.[2] *Id.* ¶ 54. Ungberg denies that Walker told him the draft was missing proper attributions to any sources. *Id.* ¶ 56. If Walker had told him that, he would have reported it immediately to the senior editors because it would have meant that her draft was not ready for the sub-cite process. *Id.* ¶ 57. Ungberg made no such report. *Id.* ¶ 58.

---

[1] At about the same time, Walker also sent her final draft to several practicing lawyers, a professor, and a fellow student, seeking their comments on her draft. *Id.* ¶ 49. Walker's cover emails said nothing about the draft having been impacted by any computer virus, being "fragmented" or "incomplete," or still needing work on the citations. *Id.* ¶ 50.

[2] Walker claims she told Ungberg she needed to "go back to the sources and compare the arguments that I was making and the quotations that I had in the text." *Id.* ¶ 55. Walker, however, concedes that at this point there would have been no way for her to determine if a citation was missing from her draft. *Id.* ¶ 27. Walker wrote her article by taking material from a "research outline" she created, in which she collected excerpts from articles and commentary about the *Bilski* case. *Id.* ¶ 24. Whenever Walker used material from the research outline in the draft article, it was her intention to include the source at that time. *Id.* ¶ 25. She would not have inserted material from the research outline into her draft article with the intention of going back at some later time and attempting to determine from what source the material had come. *Id.* ¶ 26. Indeed, if she failed to include the source during the drafting process, there would be no way for her to ascertain after-the-fact that a source was missing. *Id.* ¶ 27.

3

As the JOLT editors worked on Walker's comment, they became concerned that her argument was not original. *Id.* ¶ 60. Bradley Hamburger, one of the Co-Editors in Chief, decided to review the entire article. *Id*. ¶ 67. He used Google to run internet searches on full sentences from Walker's February 24 draft, and found that significant portions of the article had been copied from published commentary about the *Bilski* case, which Walker either had not attributed properly or, in most instances, had not attributed at all. *Id.* ¶¶ 68-69. Hamburger annotated the article by highlighting the unattributed language and quoting in the margin the source from which Walker had copied it. *Id.* ¶ 70. Hamburger did not check the entire article; he stopped after documenting *twenty-three* examples of apparent plagiarism. *Id.* ¶ 71.

Walker concedes that numerous portions of her February 24 draft consist of language that is not her own, that failed to include quotation marks to indicate that the language was not her own, and that failed to cite the sources from which she copied it. *Id.* ¶ 41. She concedes that such failures are significant, Compl. ¶¶ 24-26, and that the failures in her February 24 draft also were present in earlier drafts she delivered to JOLT, including the one she delivered February 8 – *before* the virus infected her computer. *Id.* ¶ 42. Walker cannot say there ever was a version which contained the appropriate citations. *Id.* ¶ 43.

Hamburger told Lindsay Kitzinger, his Co-Editor in Chief, what he had found. *Id.* ¶ 72. Without identifying Walker, Hamburger also consulted the professor in his professional responsibility class about whether he and Kitzinger had an obligation to report the apparent plagiarism and was advised that they should talk to Ellen Cosgrove, the Dean of Students, which they did shortly thereafter. *Id.* ¶ 73. Without identifying Walker, they first asked Cosgrove whether JOLT had an obligation to report suspected plagiarism. *Id.* ¶ 75. Cosgrove confirmed

4

that the Handbook's plagiarism rule applies to both academic and non-academic work. *Id.* ¶ 76. Hamburger and Kitzinger then described the issues with Walker's article. *Id.* ¶ 77.

Cosgrove brought the matter to the HLS Administrative Board (the "Board"), which (among other things) is responsible for addressing academic regulations and standards of conduct at HLS. *Id.* ¶ 78. The Board, chaired by Professor Lloyd Weinreb, *id.* ¶ 108, reviewed the matter and voted to go forward on a charge of plagiarism. *Id.* ¶ 79. The Board notified Walker and, in consultation with Walker's attorneys, scheduled a hearing for May 7, 2009. *Id.* ¶ 80.

Before the hearing, Walker's attorneys submitted a 29-page statement of her position and 313 pages of exhibits. *Id.* ¶ 86. At the hearing, Walker was represented by two attorneys and accompanied by her parents. *Id.* ¶ 111. Her lawyers made lengthy opening and closing statements. *Id.* ¶ 129. Walker made a statement and answered questions from the Board. *Id.* ¶ 112. Her mother spoke on her behalf. *Id.* ¶ 124. Walker did not call Ungberg or anyone else as a fact witness. *Id.* ¶ 125. Hamburger and Kitzinger spoke, answered questions from the Board, and were cross-examined by Walker's attorneys. *Id.* ¶ 130.

In her written submission and at the hearing, Walker argued that she did not violate the Handbook's plagiarism rule because she did not "submit" her February 24 draft to JOLT within the meaning of the rule. *Id.* ¶ 113. The rule forbids students to "submit work that is not their own without clear attribution of all sources, even if inadvertently." *Id.* ¶ 8. Walker argued that "the word 'submit'… must mean 'submit for publication' (*i.e.*, a final version)," whereas her draft "needed further editing and cite checking prior to publication." *Id.* ¶ 114. Walker argued that she made no effort to deceive JOLT because: she provided the full text of all her sources to Ungberg; she told him that the quotations and citations in her article needed work; and the JOLT editors knew her February 24 draft was incomplete because both she and a friend, Anna

5

Volftsun, offered to work on her article after she turned in that draft. *Id. ¶* 117. Walker also argued that Hamburger and Kitzinger falsely accused her of plagiarism as a pretext to avoid the work that would be required to publish her article. *Id. ¶* 121.

The Board was unanimous in finding that Walker violated the Handbook's plagiarism rule. *Id. ¶* 139. It was undisputed that Walker's February 24 draft contained material she had copied from various sources without attribution, and it was "quite clear" to the Board that Walker never told JOLT she needed to supply additional citations. *Id. ¶* 141. The Board did not credit Walker's assertion that, when she delivered her sources to Ungberg, she told him that she needed to do additional work on the citations; the fact that Walker did not call Ungberg as a witness led the Board to conclude that he would not have supported her testimony. *Id. ¶* 142. (The Board's conclusion was entirely correct. As discussed above, Ungberg subsequently refuted Walker's account of their conversation. *Id. ¶¶* 56-58.)

The sanction for plagiarism at HLS ordinarily is suspension. *Id*. *¶* 144. However, the Board determined that Walker should receive only a formal reprimand, allowing her to graduate on time with her class. *Id. ¶* 145. A letter of reprimand was placed in her student file and noted on her transcript. *Id. ¶* 143.

Although Walker had no right to appeal the Board's decision because it did not result in her suspension or dismissal, she nevertheless appealed to the Acting Dean of HLS at the time, Professor Howell Jackson, who agreed to review the case. *Id. ¶* 151. Following a careful review of the Board proceedings, Jackson found there was no basis for overturning its decision. *Id. ¶* 152.

**ARGUMENT**

Summary judgment is appropriate if the moving party shows there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The nonmoving party "may not rest on mere allegations or denials," but instead "must set forth specific facts showing there is a genuine issue for trial," *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)), *i.e.*, that "a reasonable jury could return a verdict for the nonmoving party."  *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 105 (1st Cir. 1988) (quoting *Anderson*, 477 U.S. at 256).

**A.    Harvard is Entitled to Summary Judgment on the Contract Claim in Count I.**

Count I of the Complaint alleges that Harvard breached its contract with Walker by reprimanding her for plagiarism because her February 24 draft was "not a 'submitted' work as defined by the [plagiarism] rule in the Student Handbook."  Compl. ¶ 45.  Walker argues:

> The plain meaning of the word "submitted" is "to yield or surrender to the will of another."  In legal terms, when a pleading or brief is "submitted" this means that it is finished and completed, left to the judge to be considered without further changes or additions.  This is plainly not what occurred when the fragmented and incomplete draft was delivered to JOLT by plaintiff.  It was delivered with the explanation that it was not completed, needed much work, and had been fragmented.  Thus, the draft was not turned over as a final or completed document for surrender to others for consideration in its current form.

*Id*.

To prevail on Count I, Walker must establish that Harvard could not reasonably expect her to understand that the Handbook's plagiarism rule applied to the February 24 draft that she turned in to JOLT.  *See Havlik v. Johnson & Wales Univ.*, 509 F. 3d 25, 34 (1st Cir. 2007) (Courts interpret the contractual terms between university and student, including those found in a student handbook, "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them.") (citing

7

*Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998)); *Schaer v. Brandeis Univ.*, 432 Mass. 474, 478 (2000) (same). Walker cannot make such a showing.

As noted above, Walker concedes that the Handbook's plagiarism rule applied to her comment, including all of the drafts that she turned in. That is hardly surprising, as she worked with JOLT during all three years of law school; she was familiar with its editorial practices; and she delivered the February 24 draft knowing it would go directly into the sub-cite process – the very purpose of which was to ensure that all the citations were accurate and complete.

Walker's arguments that her draft was "fragmented and incomplete" because of the computer virus, and that she told Ungberg she needed to do more work on the citations, are entirely beside the point for two reasons. First, the Board considered these arguments and rejected them. The arguments are implausible on their face; Walker never marshalled any evidence to support them; and in fact the evidence before the Board was overwhelmingly to the contrary. Where, as here, there are "reasonable grounds" to support the finding of a disciplinary board, *i.e.*, it is not arbitrary and capricious, that finding is not subject to further review, much less *de novo* review, by the Court. *Cloud v. Trs.of Boston Univ.*, 720 F. 721, 725 (1st Cir. 1983) (where university officials "act in good faith and on reasonable grounds," their disciplinary decision "will not be subject to successful challenge in the courts") (quoting *Coveney v. President & Trs. of Coll. of the Holy Cross*, 388 Mass. 16, 19 (1983)); *Schaer*, 432 Mass. at 479 n.9 (rejecting student's contract claim where "[t]here was ample evidence which, if believed, could have supported the board's decision"); *Berkowitz v. President & Fellows of Harvard Coll.*, 58 Mass. App. Ct. 262, 269-70 (2003) ("courts are not to intrude into university decision-making" absent evidence the decision is arbitrary or capricious); *City of Cambridge v. Civil Serv.*

*Comm'n*, 43 Mass. App. Ct. 300, 303 (1997) ("A decision is arbitrary and capricious when it lacks any rational explanation that reasonable persons might support.").

Second, even assuming Walker had submitted evidence to the Board to substantiate her claims about the computer virus and her conversation with Ungberg – which she did not – her February 24 draft violated the plagiarism rule in any event. The rule could not be more clear. It applies to "*[a]ll* work submitted by a student for *any* academic or non-academic exercise." Facts ¶ 8 (emphasis added). It is not limited to work that is "final," "finished," "complete" or "ready for publication." It makes no exception for work that is "incomplete" or "fragmented." It makes no exception for work that lacks proper attribution because of a computer virus or for any other reason, regardless of whether the author is at fault. It makes no exception for work that lacks proper attribution if the author intends later to supply it. It does not require that the author intend to commit plagiarism or to "deceive" anyone, but instead applies to any work submitted without proper attribution, "even if inadvertently."

Walker's argument that the word "submit," as used in the Handbook, means "to yield or surrender to the will of another," contravenes not only the plain meaning and context of the rule, but also basic grammar. The definition of "submit" that Walker prefers – "to yield or surrender to the will of another" – is the verb in its *intransitive* form; to "submit" in this way is something that a person herself does. The plagiarism rule, however, refers to "work submitted by a student," using the verb in its *transitive* form, which simply means to give a document or other object to someone for consideration. *See, e.g.,* Oxford Dictionaries, available at http://oxforddictionaries.com/us/definition/american_english/submit (last visited Jan. 29, 2014) (transitive verb "submit" means to "present (a proposal, application, or other document) to a person or body for consideration or judgment"); Merriam-Webster Dictionary, available at

http://www. merriam-webster.com/dictionary/submit (last visited Jan.29, 2014) (transitive verb "submit" means "to give (a document, proposal, piece of writing, etc.) to someone so that it can be considered or approved").

Simply put, the Handbook's plagiarism rule has nothing to do with a person surrendering to the will of another.  Rather, it unambiguously concerns any situation in which a student turns in any work to be considered in any academic or non-academic exercise.  Walker did just that when she turned in her February 24 draft to JOLT for the purpose of having it cite-checked, edited and ultimately published.

Because Harvard reasonably expected Walker to understand that the Handbook's plagiarism rule applied to her February 24 draft, Harvard is entitled to summary judgment on Count I.

**B.     Harvard is Entitled to Summary Judgment on the Contract Claim in Count II.**

Count II of the Complaint alleges that Harvard breached its contract with Walker because it failed to comply with the Handbook provisions for Board proceedings, which resulted in a finding of plagiarism that was "unfair."  Compl. ¶¶ 48, 54.  Specifically, Walker alleges that Harvard failed to comply with the Handbook provisions for Board proceedings in four respects, addressed in turn below.

Presented with such a claim, the Court's task is to "review the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules" and "examine the hearing to ensure that it was conducted with basic fairness," *Cloud*, 720 F.2d at 724-25 (1st Cir. 1983) (citation omitted), bearing in mind that "courts should be slow to intrude into the … student-college relationship, especially in areas of curriculum and discipline." *Russell v. Salve Regina Coll.* 890 F.2d 484, 489 (1st Cir. 1989); *see also Havlik*, 509 F.3d at 35

("[C]ourts must accord a school some measure of deference in matters of discipline.") (collecting cases).

### 1. Harvard Complied with the Rules for Administrative Board Proceedings.

In reviewing the procedures that were followed, the Court may not "second-guess or supplement the processes developed by the [university]," but instead must consider only whether the university substantially followed the rules it chose to adopt. *Sullivan v. Boston Architectural Ctr., Inc.*, 57 Mass. App. Ct. 771, 774 (Mass. App. Ct. 2003) (citing *Holert v. Univ. of Chicago*, 751 F. Supp. 1294, 1301 (N.D. Ill. 1990) (the student is "entitled only to those procedural safeguards that the [u]niversity agreed to provide")).[3]

#### a. The Administrative Board proceedings were not adversarial.

Walker claims that Harvard failed to comply with the rules for Board proceedings because the proceedings in her case were "adversarial." Compl. ¶¶ 48, 50. The Handbook says that the Board "does not consider itself an adversarial or prosecutorial body." Facts ¶ 81. This simply means that the Board proceedings are informal, in contrast to the formal, adversarial procedures one would find in a courtroom, *id.* ¶ 137, and that their purpose is not to prosecute the student but instead to treat the student as part of the HLS community and to allow the student to remain part of the community if possible. *Id.* ¶ 82. As discussed above, the Board in fact

---

[3] *See also Schaer*, 432 Mass. at 481-82 ("It is not the business of lawyers and judges to tell universities" what rules they should adopt for student disciplinary proceedings, and "[w]hile a university should follow its own rules," insubstantial departures from them "do not establish breaches of contract"); *Morris v. Brandeis Univ.*, No. 01-P-1573, 2004 WL 369106, at *3 (Mass. App. Ct. Feb. 27, 2004) (unpublished opinion) (affirming summary judgment for university on a student's contract claims, notwithstanding errors in connection with student disciplinary proceedings, because the process in any event was fair, the student had "no valid defense" to the charge of plagiarism, and there was no evidence of bad faith or improper motive on the part of the university); *Beauchene v. Mississippi Coll.*, No. 3:12-cv-784, 2013 WL 5965698, at *13-14, 16 (S.D. Miss. Nov. 8, 2013) (a law school's deviations from its disciplinary procedures did not preclude summary judgment for the school on a student's contract claims where the student's "blatant and pervasive" plagiarism breached his contract with the school and any deviations by the school were insignificant).

allowed Walker to remain part of the HLS community notwithstanding the blatant and pervasive plagiarism in the article she submitted to JOLT.

Walker contends that Weinreb, as Chair of the Board, "conducted the hearing ... in an adversarial manner throughout" and "set an adversarial tone for the hearing." Compl. ¶ 50. The hearing transcript (Ex. D to Facts) contradicts Walker's claim completely. The transcript confirms that Weinreb adhered to his standard practice to be "non-adversarial" and to "avoid the contentiousness of [the] adversary process" one would find "in a courtroom." Facts ¶ 109.

Walker claims that Weinreb created an "adversarial tone" in the hearing by allowing Hamburger and Kitzinger to confer with each other before answering questions. Compl. ¶ 50. Weinreb reasonably concluded it was appropriate for them briefly to confer about matters they had engaged in jointly as Co-Editors in Chief. Facts ¶ 135. In fact, Hamburger and Kitzinger conferred only for the limited purpose of deciding which of them would answer a question that was put to the two of them. *Id*. ¶ 136. Moreover, the hearing is informal, *id*. ¶ 137, and there is nothing in the Board rules to prohibit witnesses from conferring with each other. *Id*. ¶ 81.

Walker contends that Weinreb also created an "adversarial tone" at the hearing by not allowing her attorneys to speak on her behalf. Compl. ¶ 50. Here, too, the transcript belies her claim. Her attorneys were permitted to make lengthy opening and closing statements, question each witness, and interject their views throughout the hearing. Facts ¶¶ 129-31. On only one occasion did Weinreb request that Walker herself answer a question, rather than having her attorneys answer on her behalf: Weinreb asked Walker whether in fact she believed that Hamburger and Kitzinger falsely accused her of plagiarism as a pretext, because they did not

want to do the work required to prepare her article for publication. *Id*. ¶ 122.[4] It was entirely reasonable for Weinreb to ask that Walker herself answer the question about what she believed. Moreover, the Handbook provides only that "students in disciplinary cases may appear *with* legal counsel," not that they may appear *through* counsel. *Id*. ¶ 81 (emphasis added). Harvard reasonably expected Walker to understand that if she appeared before the Board and gave a statement, she could be asked appropriate questions put directly to her. Moreover, Walker cannot say that she was prejudiced by having to answer this question herself. *Id*. ¶ 123. Nor can she identify any point that her lawyers were prevented from making on her behalf. *Id*. ¶ 134.

Walker contends that Dean Cosgrove also made the Board proceedings adversarial, because she "failed to act as an impartial liaison" between the Board and Walker and "was consistently hostile" to her and her lawyers. Compl. ¶ 50. There is no such evidence.

Walker claims that Cosgrove was adversarial in that she "rebuff[ed] every attempt at an informal resolution that would avoid an Administrative Board hearing." *Id*. However, the Handbook creates no right to an "informal resolution" and in fact serious allegations of plagiarism never are resolved "informally." Facts ¶ 95.

Walker alleges that Cosgrove also was adversarial when she initially "refused to conduct discovery into … internal JOLT emails." Compl. ¶ 50. Walker apparently thought such emails might contain evidence that Hamburger and Kitzinger conspired to falsely accuse her of plagiarism. However, it was not Cosgrove's job to conduct discovery on Walker's behalf. Facts ¶ 89. Walker concedes that internal JOLT emails ultimately were produced, *id*. ¶ 93; she has no reason to believe the production was incomplete, *id*., and in fact it *was* complete – Hamburger

---

[4] As the Board concluded, Walker's pretext theory makes no sense. The editors-in-chief had complete discretion not to publish Walker's article for any reason, including the fact that her drafts were over the applicable word limit and in poor shape when she delivered them. *Id*. ¶ 48. Making a charge of plagiarism also meant that the editors would have to be involved in a difficult Board proceeding when they not only were preparing the spring edition of JOLT for publication but also were preparing for and taking their final exams. *Id*. ¶ 97.

13

and Kitzinger produced all of their emails concerning Walker and her article. *Id.* ¶ 92. Not surprisingly, the emails contained no evidence of any plan to falsely accuse Walker of plagiarism. *Id.* ¶ 94.

Walker further complains that Cosgrove was adversarial when she denied Walker extensions on papers and exams, which Walker requested in order to have more time to prepare for the Board hearing. Compl. ¶ 50. However, such extensions are limited to "emergency illnesses and other urgent issues" that do not include Board proceedings, Facts ¶ 99, and Walker cannot demonstrate that she was harmed – *i.e.*, cannot identify anything that she was unable to do to prepare for the hearing – because she was not granted the extensions. *Id.* ¶ 100. Walker alleges that Cosgrove "coached" Hamburger and Kitzinger, but not Walker, before the hearing. Compl. ¶ 50. However, Walker concedes that: she requested no such coaching; she does not know what Cosgrove actually said to Hamburger and Kitzinger; and she cannot say that whatever Cosgrove told them had any impact on their testimony before the Board. Facts ¶¶ 104-106. In fact, Cosgrove did not "coach" Hamburger or Kitzinger. *Id.* ¶ 101-02.

Finally, Walker alleges that Cosgrove failed to act impartially by voting as one of three administrators appointed to sit on the Board. Compl. ¶ 50. However, it is undisputed that Cosgrove is not a voting member of the Board and did not vote in Walker's case. Facts ¶ 146.

        **b.**    **The hearing was concluded in the manner most favorable to Walker under the circumstances.**

Walker contends that Weinreb violated the Handbook's "promise" to resolve the Board hearing "in the manner most favorable to [her]," because "he deemed 'submitted' [her] uncompleted, virus-impaired draft" and "engaged in additional unfair conduct." Compl. ¶¶ 48, 51. The Handbook provides that the Board's "disposition is to handle matters that come before it as favorably to students as possible *consistent with the maintenance of the high academic and*

14

*ethical standards of Harvard Law School.*" Facts ¶ 81 (emphasis added). Those "academic and ethical standards" include the Handbook's plagiarism rule, which provides that a student *will* be subject to discipline if she submits for any exercise any work that is not her own without proper attribution of all sources, even if inadvertently. The Board – not just Weinreb – was unanimous in finding that Walker violated that standard. Although the usual sanction for plagiarism is suspension and there was substantial support for suspension on the Board, the Board ultimately chose only to reprimand Walker. *Id.* ¶ 144. The matter thus was resolved as favorably to Walker as possible, consistent with the maintenance of HLS's high academic and ethical standards. To find for Walker on this point would require the Court to consider only the phrase "as favorably to students as possible," disregarding entirely the phrase that follows: "consistent with the academic and ethical standards of [HLS]."

    c. **Walker's attorneys were allowed to cross-examine witnesses.**

  The Handbook provides that an accused student "shall have the right to call his or her own witnesses and to examine all witnesses." Facts ¶ 81. Walker alleges that Weinreb prevented her attorneys from cross-examining Hamburger and Kitzinger on two issues – whether JOLT lost or destroyed the electronic copies of her sources that she delivered to Ungberg, Compl. ¶ 52, and whether Hamburger and Kitzinger actually believed that Walker committed plagiarism. Facts ¶ 132. Her claim is unavailing on both issues.

  The first issue never was disputed and is irrelevant in any event. It never was disputed, and the Board accepted as true, that Walker delivered to Ungberg two electronic files containing Westlaw versions of all her sources. Facts ¶ 140. It also was undisputed that JOLT did not keep them, for the simple reason that the Westlaw versions were of no use to JOLT; the journal uses only sources in their original, published format, not the Westlaw format, for the sub-cite process.

15

*Id.* ¶ 53.  The fact that Walker provided copies of all her sources to JOLT was irrelevant in any event.  The issue was not whether she had provided copies of her sources to JOLT, but whether she had used material from those sources without proper attribution.  Moreover, Walker concedes that it was her responsibility as the author to properly cite all of her sources and that it was not the job of the JOLT editors or staff to determine whether any citations were missing from her draft – *i.e.*, the role of the editors and staff is to review the citations the author has provided, not to determine whether any are missing altogether.  *Id.* ¶ 120.

The second cross-examination issue also is a red herring.  Weinreb questioned the relevance of asking Hamburger and Kitzinger whether they believed that Walker had committed plagiarism – it only mattered whether the Board, not the JOLT editors, concluded that she did.  Nevertheless, Walker's attorneys were not prevented from asking the question.  They asked Hamburger, who replied that he did think Walker had plagiarized.  *Id.* ¶ 132.  Walker's attorneys, no doubt leery about eliciting more unfavorable testimony, chose not to ask Kitzinger the same question.  *Id.* ¶ 132.

        **d.**     **The decision was supported by clear and convincing evidence.**

The Handbook provides that "[d]isciplinary sanctions shall not be imposed unless conduct warranting sanction is established by clear and convincing evidence."  *Id.* ¶ 81.  Walker contends that the Board's decision was not so supported in her case.  Compl. ¶ 53.  This argument is without merit.

That Walker submitted work that was not her own without proper attribution was more than supported by clear and convincing evidence – it was undisputed.  Walker's defense – that she never intended to deceive anyone, as demonstrated by the fact that she turned over all of her sources and (allegedly) told Ungberg that she needed to do more work on the citations – was

16

implausible on its face and not supported by any evidence. In fact, the evidence – especially Walker's own emails concerning her final draft, which said "All the sources are included," and which made no mention of the draft being incomplete or missing any citations – was overwhelmingly to the contrary. It is beyond question that the Board's decision was supported by clear and convincing evidence.

### 2. The Administrative Board Proceedings Were Conducted with Basic Fairness.

Disciplinary proceedings are "conducted with basic fairness" if the student has notice of the charge and an opportunity to be heard and the decision-maker does not act arbitrarily or in bad faith. *See Cloud*, 720 F.2d at 725; *Kiani v. Trs. of Boston Univ.*, No. 1:04-cv-11838, 2005 WL 6489754, at *8 (D. Mass. Nov. 10, 2005); *Schaer*, 432 Mass. at 481. The Board's process met that standard.

Walker concedes that, consistent with the Board's rules, she had notice of and understood the charge against her and was granted a hearing before the Board. Facts ¶ 110.[5] There is no evidence that Cosgrove, Weinreb or anyone else was biased against Walker, who concedes that she is aware of no reason that they would be biased against her. *Id.* ¶ 153. Nor is there any evidence that the Board's decision was arbitrary and capricious. To the contrary, as discussed above, the Board's decision was supported by overwhelming evidence of blatant, pervasive plagiarism in violation of the Handbook rule.

Accordingly, Harvard is entitled to summary judgment in its favor on Count II.

---

[5] Walker further concedes that, consistent with the Board's rules, she had the right to a public hearing, but did not request one; she had the right to ask members of the Board to recuse themselves, but made no such request; she had the assistance of legal counsel, both at the hearing and in preparation for it; she had the right to request assistance from Harvard in paying for her attorneys, but made no such request; her attorneys were permitted to speak on her behalf and to cross-examine witnesses; she was permitted to make a written submission, with voluminous exhibits, in advance of the hearing; there were no documents or other evidence that she was not permitted to introduce; she had the opportunity to testify at the hearing and had the opportunity to say to the Board everything that she wanted to say; she was allowed to call witnesses to testify on her behalf, although she did not do so; and a transcript was made of the hearing, which was made available to her. Facts ¶¶ 110.

### C.  Harvard, Weinreb and Cosgrove are Entitled to Summary Judgment on the Defamation Claim in Count IV.

Count IV alleges that the defendants defamed Walker because her HLS transcript states that she "was issued a letter of Reprimand by the Administrative Board;" the letter of reprimand states that she committed plagiarism, which Walker claims is false; and the defendants "knowingly and intentionally communicat[ed] and publish[ed] [these] false statements." Compl. ¶¶ 64-66. To prevail on Count IV, Walker must prove that one or more of the defendants published a false statement of fact about her, without privilege, which has discredited her "in the minds of [a] considerable and respectable segment of the community." *Draghetti v. Chmielewski*, 416 Mass. 808, 811 (1994) (quotation omitted). She cannot do so.

First, Walker's defamation claim fails for the simple reason that the allegedly defamatory statements are true. It is true that Walker was reprimanded by the Board for committing plagiarism and that in fact she submitted work that was not her own without proper attribution.

Even if Walker could establish one or more of the statements at issue was false, it is beyond dispute that they were privileged. The publication of an otherwise defamatory statement is conditionally privileged if "the publication is reasonably necessary to the protection or furtherance of a legitimate business interest." *Bratt v. Int'l Bus. Machs. Corp.*, 392 Mass. 508, 512-13 (1984) (citation omitted). "[T]he plaintiff bears the burden on summary judgment to show, by 'clear and convincing evidence,' that the defendant abused the privilege," *Sovie v. Town of N. Andover*, 742 F.Supp.2d 167, 174 (D. Mass. 2010), *i.e.,* by publishing the statements with "actual malice" or excessively and unreasonably. *Catrone v. Thoroughbred Racing Assocs. of N. Am.*, 929 F. 2d 881, 889 (1st Cir. 1991). Excessive and unreasonable publication requires proof that the defendant acted with reckless disregard of the truth. *Thomas v. Sears, Roebuck & Co.* 144 F.3d 31, 34 (1st Cir. 1998); *Bratt*, 392 Mass. at 515-16.

The statements at issue were conditionally privileged. At HLS, as at any other university, plagiarism is a serious violation of academic rules. As Dean Cosgrove explained, "it undermines the academic integrity of the institution; it creates an unfair advantage [for] one student against other students who are similarly situated, and can affect the reputation of the institution as a whole." Facts ¶ 96. To further these legitimate interests of HLS, it was reasonably necessary for the Board to reprimand Walker for her plagiarism and for that sanction to be documented in her file and on her transcript pursuant to HLS policy. *See Beauchene*, 2013 WL 5965698, at *8.

Moreover, there is no evidence that the statements at issue were published with actual malice or in a manner that was unreasonable or excessive. The letter of reprimand is not disseminated but is kept on file with the HLS registrar, *id*. ¶ 147, and Walker's transcript is seen only by those to whom she releases it. *Id*. ¶ 148. There is no evidence that Weinreb or Cosgrove published her transcript to anyone and no evidence that Harvard published it to anyone except as Walker directed. *Id*. ¶¶ 148-49.

Finally, the record is also devoid of evidence that the statements at issue discredited Walker "in the minds of [a] considerable and respectable segment of the community." *See Draghetti*, 416 Mass. at 811.

For all these reasons, Harvard, Weinreb and Cosgrove are entitled to summary judgment on Count IV.

**D.  Harvard is Entitled to Summary Judgment on the Claim for Injunctive Relief in Count VI.**

Count VI asserts that Walker has suffered "irreparable injury" as a result of the reprimand and that Harvard should be ordered to remove it from her record. Compl. ¶¶ 73-75. Because Walker's contract and other claims fail, for the reasons set forth above, Harvard is entitled to summary judgment on her claim for injunctive relief as well.

**CONCLUSION**

The Defendants' Motion for Summary Judgment should be allowed.

                PRESIDENT AND FELLOWS OF HARVARD COLLEGE, ELLEN COSGROVE and LLOYD WEINREB,

                /s/ Daryl J. Lapp
                Daryl J. Lapp, BBO No. 554980
                  dlapp@edwardswildman.com
                Jamie C. Notman, BBO No. 675597
                  jnotman@edwardswildman.com
                EDWARDS WILDMAN PALMER LLP
                111 Huntington Avenue
                Boston, MA  02199
January 31, 2014        (617) 239-0100

**CERTIFICATE OF SERVICE**

On January 31, 2014, I caused a true copy of the foregoing document to be filed electronically using the CM/ECF system, which effected service upon all counsel of record.

                /s/ Jamie C. Notman
                Jamie C. Notman

AM 28166898.1