UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MEGON WALKER,

       Plaintiff.

v.

President and Fellows of HARVARD
COLLEGE, also known as HARVARD
CORPORATION, *et al*,

       Defendants.

1:12-cv-10811-RWZ

## PLAINTIFF MEGON WALKER'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### This Memorandum

Plaintiff Megon Walker ("Walker") respectfully submits this Memorandum in opposition to the Defendants' Motion for Summary Judgment (Docket No. 32). Walker addresses herein the Memorandum In Support of Defendants Motion for Summary Judgment (Docket No. 33) (hereinafter "Harvard Memo") and Defendants' Statement of Undisputed Material Facts (Docket No. 34) (hereinafter "Harvard Facts"). This Memorandum is accompanied by a separate Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("Fact Response") and refers to both throughout this Memorandum. The defendants are for simplicity and focus frequently referred to herein collectively as "Harvard."

### Summary Statement

### Walker's Claims

This dispute arises from a plagiarism finding made in the spring of 2009 by Harvard against third-year law student Megon Walker ("Walker"). This damning finding has, since 2009,

been stamped on her transcript. It has caused a prestigious employer to rescind its employment offer to her and has resulted hundreds of rejections from law firms, many of which had initially shown a keen interest in her as an applicant until the point in the application process when she disclosed Harvard's plagiarism finding. Walker sues in contract contending that her conduct was not plagiarism under her reasonable understanding of the definition of plagiarism as Harvard Law School has defined that term in its Student Handbook ("Handbook"). She also claims breach of contract because of the manner by which the Harvard disciplinary committee conducted the hearing at which it found her guilty of plagiarism, alleging that it did not conduct that hearing in the manner promised in its Handbook. Lastly, she sues in libel because she did not plagiarize and Harvard falsely publishes that she is a plagiarist every time she seeks employment.

**Defendants' Motion**

Many of the Harvard Facts are subject to genuine dispute based on contradictory evidence discussed below. Moreover, in its Memo, Harvard misunderstands the law applied to the factual disputes. *First*, Harvard incorrectly contends that its Handbook's definition of plagiarism should be interpreted by considering only whether it was reasonable for *Harvard to expect* that Walker would understand that her incomplete draft JOLT[1] article was a "submission" subject to plagiarism as defined in the Handbook. Yet Massachusetts law insists that the terms of a Handbook be construed also by considering also what *the student would expect* that term to

---

[1]     "JOLT" refers to Harvard Law School's student-run *Journal of Law and Technology* in which interested students "publish scholarship dealing with issues at the intersection of law and technology" (according to its website). In the spring of 2009, Walker was drafting and turning in to JOLT editors drafts of an article concerning a recent legal decision entitled *In Re Bilski*, 545 F.3d 943, 88 U.S.P.Q.2d 1385 (Fed. Cir. 2008), a highly technical court decision decided by the United States Court of Appeals for the Federal Circuit. The *Bilski* decision articulated new law relating to a certain type of patent known as the "process patent." *In re Bilski*, 545 F.3d at 951.

mean. *Second*, Harvard incorrectly urges this Court to give broad "deference" to its interpretation of the plagiarism rule (and to the conduct of the disciplinary hearing), and that the Court should find for Harvard unless it is found to have acted in an "arbitrary and capricious" manner. However, the law is clear that such deference and the "arbitrary and capricious" standard simply give no refuge if there is an applicable rule stated in the Handbook. Where there is, as in this case, it must be followed. Indeed, in construing any such rule, far from deferring to Harvard, any uncertainties should be resolved against the school, not the student.

Using the appropriate construction, there are substantial issues of fact that cannot be decided summarily. As the evidence discussed below will show, Walker's draft of her article was plainly not ready for "submission" as she understood that term used in the Handbook in reference to plagiarism. It was incomplete and well over the maximum word limitation. Everyone knew this because she said so repeatedly by email and verbally, and the editors just as repeatedly acknowledged the need for more work just to finish it. In light of the evidence discussed below demonstrating this, there is a substantial question of fact on the ultimate issue, namely whether it was reasonable for either Harvard or Walker to understand that her draft would be subject to the plagiarism rule. There are also genuine issues of fact as to what Walker stated to the editors, and what the understanding was between them and her concerning her article.

Nor can the libel claim be summarily dismissed. Harvard made the finding. Harvard published it. Harvard decided to place it on Walker's transcript, and if it is false, meaning if Walker did not plagiarize, Harvard should be held responsible for the damage its publications have caused.

## FACTUAL DISCUSSION

### Megon Walker's Academic and Professional Achievements

Megon Walker was about to graduate from Harvard with an impressive pedigree, including high honors in College, a PhD in a dual degree program in bioinformatics from Boston University (Response Fact. No. 1)  and employment at an impressive law firm, Fish & Richardson. Walker Dep. 69:9-70:3. Walker in her first year  had signed on with JOLT as a sub-citer, checking the format of footnotes and the content of source materials of draft articles. *Id*., 56:2-23. She remained with JOLT until the plagiarism incident in her third year. After this incident she left with a plagiarism mark in her permanent record and Fish & Richardson had rescinded her employment officer. Fact Response 148; Walker Ex. 15.

### Facts Relevant to Whether Walker's February 24th Draft Was Subject to the Handbook's Plagiarism Rule

As set out in Defendants' papers, Walker concedes that she was familiar with the law journal editing process from her previous participation as a JOLT sub-citer on others' draft articles.  *See*, Def. Ex. A, 55:21-66:8. Walker's familiarity included an understanding of the sub-citing process and tech-edit process involved in preparing an article for publication in a journal. *See*, Def. Ex. A, 56, 145. Her past involvement had taught her when the various stages of the article-editing process were triggered and the state of completeness required before each, alone making it unlikely that she would have understood that her "latest draft" (to use the phrase even Harvard has assigned to the draft giving rise to this case, *see* Harvard memo p. 3) would be understood to be a submission subjecting it to scrutiny for plagiarism.

The JOLT schedule set February 22, 2009 as the date for the submission of a final article for the technical editing process. Def. Ex. A, 130:3-9. Walker turned in an initial draft around February 2, 2009 and then sent in a revised draft on or around February 8, 2009. That draft was

4

sent to the student writing committee for review; it was clearly rough and incomplete and significantly exceeded the allowed word limit. Fact Response 23; 28; Walker Ex. 16 and 17. Then her problems began. Her laptop was struck with a virus that disrupted her ability to meet the journal deadlines. *See* Defendants Ex. H.

At that point she fell behind.  The following facts support Walker's contention that despite the editing process typically followed for law review articles, she could not reasonably have expected that process to be applied to her draft article, nor that her "latest draft," turned in on February 24, would be subjected to the Harvard plagiarism rule. This evidence creates a genuine issue of fact concerning a dispositive issue. Certainly the evidence creates many issues of fact concerning what was actually said and understood.

- The deadline for all the final drafts that spring had been set for February 22, 2009 and once submitted, they would go through the normal editing process designed by JOLT. Fact Response 34; Def. Ex. A, 135:7 – 137:24.

- As she was working on an earlier draft, a virus hit her computer and Walker informed JOLT, through an email to JOLT Editor Doug Kochelek on February 16, 2009, that her computer hard drive had a virus (had crashed) and she was working on backing up her article files at the IT Help Desk, the law school center set up to fix student computers with problems. Fact Response 32; Def. Ex. H.

- While at the IT Help Desk, Walker saw Anna Volfstun, JOLT's Submissions Editor, and informed Volfstun that her laptop lost data including revisions to her draft article. Fact Response 33; Def. Ex. U, Volfstun Affidavit, ¶3.

- Walker also informed Volfstun that as a result of the virus, the draft was not near final form and would require more work before being ready for publication. Fact Response 33; Def. Ex. U, Volfstun Affidavit, ¶4.

- After sending to JOLT a partially-recovered draft of the article on February 16 (Def. Ex. H), the next scheduled turn-in date, Walker attended the JOLT student writing committee meeting on February 17 during which she discussed with JOLT members the loss of data on her computer as a result of the virus. Fact Response 33; Def. Ex. A, 137:14-24.

- Walker's final draft was due February 22 but she was unable to meet the deadline or finalize her draft despite working on it extensively during the intervening days. Def. Ex. A, 135:7 – 137:24. *See also,* Fact Response 33; Walker Ex. 2 (email from Walker to JOLT on 2/22/09 at 10:05am stating "I doubt that I can send it before 10 tonight. Footnotes and proofreading are taking all weekend."); Walker Ex. 3 (Walker email to JOLT on 2/22/09 at 6:43pm stating "I'm still on it."); Walker Ex. 4 (Walker email to JOLT on 2/23/09 in response to JOLT email asking for "ETA" on receiving the draft: "Tell them tonight. I'm over the length limit again and cutting more."); Def. Ex. J (Email from JOLT to Walker on 2/24/09 at 9:57am: "We need your draft…every other student has gotten their piece in … it's not fair to the AE and LE [author editor and line editor] . . . ."

- By February 24, Walker had still not finalized the draft. Fact Response 36; Def. Ex. J (Email from Walker to JOLT on 2/24/09 sent at 1:20 pm stating, in response to JOLT's demand for her article, already two days late: "ok, sending it now. All the

sources are included, but I'm still moving words around."; Def. Ex. I[2] (Email from Walker to JOLT on 2/24/09 at 1:26pm, with draft article attached, stating: "Here's *the latest draft* of the Bilski piece. Sorry about the delay. Let me know if you have difficulty finding any sources." (emphasis added))

- Walker then discussed with Editors in Chief Kitzinger and Hamburger, and her line Editor Ungberg, and certainly did not keep to herself, the need to continue working on her draft after the subciting process that was scheduled to start after the February 24 draft was turned in (Def. Ex. A, 137:15-24), even though typically once an article goes through subciting, further author edits should not significantly upset the completed subcited citations (Def. Ex. A, 61:6 – 62:1). Fact Response 36.

- On February 27, the day after turning in her latest draft, Walker delivered of all her source material to JOLT line editor Andrew Ungberg in person because they were too large to have been sent via email along with the draft article sent the day before. Fact Response 33. They were all in PDF form. Walker Ex. 5 (Email chain between Walker and JOLT concerning attempts to email sources and arranging to meet in person.)

- The sources given by Walker to Ungberg included those from which her draft had quoted without attribution and it was her reasonable expectation that doing this made it obvious to everyone that the draft was not finished since if the text of her draft was compared to these sources, it could be easily see that the draft contained sections lifted from the sources she was providing to be reviewed with the draft. *See*, Fact Response 36; Def.Ex. A, 141:6-14 to 145:22

---

[2]     Defendants' Exhibit I is incomplete, including only page one of a four-page email.  The complete email chain is included at Walker Ex. 5.

- While with Ungberg to deliver her sources, Walker discussed with him her problems with lost data, her attempts to reconstruct her article, that she was not finished fixing the article, including citations and quotations to sources, and that she wanted to be involved in the tech-editing process because of this circumstance. Fact Response 33, 47; Def. Ex. A, 141:6-14 to 145:22.

- Harvard is simply wrong to assert that Ungberg "denies" that Walker told her these matters. *See*, Harvard "Undisputed Fact" ¶ 56. Instead, he testified that he could not recall whether or not she had told him, but confirmed that it was apparent from Walker's emails that she was still working on the draft article after she handed in the version on February 24. Fact Response 56; Walker Ex. 14, 21:11 – 22:12; 111, 112.

- On February 27, Walker emailed that she was still working on the draft. Fact Response 36; Walker Ex. 5 (Email from Walker to JOLT on 2/27/09 at 9:28 a.m. stating "I'm still getting comments/feedback from partners at Fish. If I send a revised copy TONIGHT, is that too late??? I don't want to get in the way…. Did you guys pull sources already?")

- From her own experience, Walker understood that authors continued to make changes or additions to an article draft after the sub-citing stage during author edits. Fact Response 39; Def. Ex. A, 62:9 – 63:4.

- Walker continued to work with JOLT in correcting the footnote citations in the February 24th draft.  Fact Response 37; Walker Ex. 6 (email chain between Walker and JOLT on 2/27/09 concerning pin cites and assistance with sources in the article.)

- During the tech-editing process in March, Volfstun observed that "on its face, it [Walker's draft article] required a substantial amount of work prior to being in

publishable form, and therefore based on [her] experience would require substantially more editing than typical other articles would require." Fact Response 48; Def. Ex. U, Volfstun Affidavit, ¶5.

- The unfinished state of the article was evident to the JOLT editors as well. Fact Response 48; Walker Ex. 9, 82:13-15 (recalling rough shape of the article); Walker Ex. 10, p. 21:1-9 (recalling rough shape of footnotes and citations); Walker Ex. 11 (email from JOLT editors on February 24, 2009 apologizing to other JOLT members working on the article for "rough shape" of the article); Walker Ex. 12 (email from Sarah Spurgeon of JOLT to other editors on 3/10/09 stating "Do note if we keep the article, a LOT of re-writing needs to be done for the sake of clarity."); Walker Ex. 13 (JOLT email of 2/28/09 switching the editors assigned to Walker's article because "we're kind of worried about that piece.")

- Walker and Volfstun discussed the need for substantially more work to be done on the article (than is typical at this stage) and communicated to Kitzinger, Hamburger, and Ungberg that they both were available to work on the footnotes and substance of the article. Fact Response 48, 65; Def. Ex. U, Volfstun Affidavit, ¶6; Walker Ex. 7 (email from Anna Volfstun to JOLT on 3/11/09 stating that Walker was willing to continue working on the piece, noting that Walker regretted how much work was necessary to fix the footnotes and stating that Volfstun volunteered to help with the substantive part of the draft article, too.)

- JOLT Co-Editor-In-Chief Lindsay Kitzinger was aware Walker was continuing to work on the draft after emailing the latest draft on February 24. Fact Response 40; Walker Ex. 9, 88:21-89:1.

- JOLT Co-Editor-In-Chief Bradley Hamburger recalls Walker expressed her desire to continue working on the draft article after turning in the latest version on February 24. Fact Response 40; Walker Ex. 10, 100:24 – 101:24.

- As shown by the facts above, Walker had repeatedly expressed her concerns to JOLT over the unfinished, over limit, rough version of her work and took note at her deposition that the Handbook provides "Students who are in any doubt about the preparation of their work should consult the appropriate instructor, supervisor, or administrator before it is prepared or submitted." (Def. Ex. F, Handbook, p. 44).

- In her deposition, while Walker acknowledged that certain attribution problems existed in earlier drafts written prior to the computer virus (as highlighted by Harvard "Undisputed Fact" ¶ 43), she made clear she was in the process of revising and correcting these problems when the virus struck and she was never able, in the time she had left to get a draft to JOLT, to completely correct all problems. Fact Response 43; Def. Ex. A, 175:3-11 and 176:5-7 (where Walker testified "  . . .I don't know if I had corrected them [missing attributions] after and lost it or if it was just never corrected, I don't know which of those two is what actually occurred…the problem here, is that I lost a lot of my work, I was not able to reconstruct it.

- Walker then made clear that the need to fix these attributions was "part of the reason I was trying to involve myself in the sub-cites especially" (Def. Ex. A, 176:5-7) after turning in the February 24th draft.  Fact Response 43.

**Facts Relevant to Whether the Administrative Board Hearing Met the Requirements of the Handbook**

After being notified that an administrative board hearing was scheduled on the charge of plagiarism for May 7, 2009, Walker retained counsel and began preparing her defense. Def. Ex.

A, 195:20-23; 197:18 – 198:8. However, despite the Handbook provision that "The Board does not consider itself to be an adversarial or prosecutorial body," and that Walker had a right to have counsel appear on her behalf and cross-examine witnesses (Def. Ex. F, Handbook at pp. 55-56), Walker's attorneys' cross-examination of certain witnesses was interrupted or thwarted by Harvard repeatedly during the hearing, to the detriment of Walker. Fact Response 110.

Specifically, Professor Weinreb (who presided as the judge at Walker's disciplinary hearing) did not allow Walker's attorneys to question the key witnesses Hamburger and Kitzinger[3] individually (Def. Ex. D, 30:3-8). Instead, Weinreb allowed them to be present together and to confer with each other while they were being cross-examined. Fact Response 110; Def. Ex. D, 30:3-8. Weinreb and Cosgrove (the Dean who supervises JOLT and who referred Walker's case for a hearing) interrupted Walker's attorneys when they tried to question Hamburger and Kitzinger about the whereabouts of the sources that Walker had turned in with her latest draft, and when they sought to ask why those sources had been destroyed. Fact Response 110; Def. Ex. A., 234:20-235:14; Def. Ex. D, 47:6-20.[4]

Weinreb interrupted Walker's attorneys when they tried to ask Hamburger and Kitzinger about the e-mail records that show the exclusion from the tech editing process of both Walker and Anna Volfstun (Fact Response 110; Def. Ex. A, 235:20-24), both of whom had sought to assist as they were seeking to add to her draft. Weinreb prevented Walker's attorney from

---

[3]      Hamburger and Kitzinger were the co-Editors-in-Chief of JOLT who referred Walker's latest draft to Dean Cosgrove for plagiarism. Harvard Memo p. 4-5.

[4]      These missing sources were and remain crucial. They contain the very cases and other sources that had been excerpted without attribution (as yet) by Walker in her latest draft. A fair inference is that a plagiarist passing off those quotes in her draft as her own would not turn in that draft containing those unattributed excerpts along with the very sources from which they were taken. An equally fair inference is that Walker, turning in a draft accompanied by the sources, would not reasonably understand that her latest draft would be considered a subject for final vetting under the normal schedule – it was already late − nor be subject to the plagiarism rule.

questioning Hamburger and Kitzinger about whether Walker intended the draft she sent to them via email to be what she intended to publish. (Fact Response 110; Def. Ex. D, 81:24-82:18); and Cosgrove cut the hearing short in the middle of Walker's attorney's closing argument.  (Fact Response 110; Def. Ex. D, 4:3-8; 163:21-23). Additionally, Walker was required to answer certain questions posed by the Board, despite Walker's continued assertion that she would prefer her attorneys answer for her given their nature.  Fact Response 110; Def. Ex. A, 236:24 – 237:7; Ex. D at 142:13-144:2; 146:19-147:24.

## ARGUMENT

### I.  SUMMARY JUDGMENT STANDARD

Harvard's description of the summary judgment process (Harvard Memo, p. 7) omits that the evidence relevant to the motion must be "*viewed in the light most flattering to the party opposing the motion*." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995). From that perspective, summary judgment should be denied.

### II.  PROPER CONSTRUCTION OF THE HARVARD HANDBOOK IS NOT AS HARVARD ARGUES IN ITS MEMORANDUM

#### A.  The Handbook Must Be Construed By Considering The Reasonable Expectations of *Both* Harvard *And* Walker as To What The Terms Mean

Count 1, involving the definition of plagiarism, and Count 2, involving Harvard's disciplinary procedures, center on Harvard's Student Handbook.  A student handbook setting forth rules of conduct and procedures to be followed at disciplinary hearings concerning charges of rules violations is a contract binding on both the student and the school. See, *Cloud v. Trustees of Boston Univ.,* 720 F.2d 721, 724 (1st Cir.1983). Under Massachusetts law, unlike the Rhode Island law quoted by Harvard (Harvard Memo, p. 7), the terms of the handbook are interpreted based on the reasonable expectations of *both* the student and the school:

> . . . we employ "the standard of 'reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.' " *(citations omitted)* We therefore review each factual allegation to determine whether Schaer [the student] has asserted facts which establish that Brandeis failed to meet his reasonable expectations, thereby violating its contract with Schaer.

*Schaer v. Brandeis University*, 432 Mass. 474, 735 N.E.2d 373 (2000)

There is a double question here which Harvard's Memo does not address. It is not simply, as Harvard's quote of the Rhode Island-based *Havlik*[5] decision suggests, whether Harvard would "reasonably expect her [Walker] to understand that the Handbook's plagiarism rule applied to the February draft . . ." [Harvard Memo at p. 7.] It is also whether the school's interpretation given to a particular handbook provision is in line with *the student's* reasonable expectation:

> Thus, if the university explicitly promises an appeal process in disciplinary matters, that process *must be carried out in line with the student's reasonable expectations.*

*Cloud, supra,* 720 F.2d at 724-25. (emphasis added) See also, *DMP v. Fay Sch. ex rel. Bd. of Trustees*, 933 F. Supp. 2d 214, 223 (D. Mass. 2013) (Hillman, J.).

In *DMP,* [6] the student involved was a ninth grader with ADHD who had a series of discipline problems culminating in having been seen by his teacher looking at the computer screen of another student during a pop quiz, and copying on to his test answer page what was on that screen. Because the student was already on probation, the cheating offense qualified him for

---

[5]    *Havlik v. Johnson & Wales University*, 509 F.2d 25 (1st Cir. 2007), quoted at Harvard Memo p. 7, involved a case against a university located in Rhode Island. The federal court's jurisdiction was based on diversity of citizenship (*Id.* at 28), and thus *Havlik* was "governed by Rhode Island law." (*Id.* at 35). The case before this Court involves Harvard and actions occurring in Cambridge, Massachusetts and is thus governed by Massachusetts law.  *See*, *Auto Europe, LLC v. Connecticut Indem. Co.*, 321 F.3d 60, 64 (1st Cir. 2003). We note this distinction because the Massachusetts cases are more numerous and more clear than *Havlik* that, when interpreting handbooks, it is the reasonable expectation of both parties, not just the school, that must be considered and that doubts are resolved in favor of the student (see text further below), a point on which no Rhode Island law has been identified.

[6]    *DMP* is a case involving a minor, hence the initials in the case title.

potential dismissal from the school. The Head of School dismissed him. The student contended

in his lawsuit that such dismissal violated the Fay School Student Handbook requirement that he

be allowed a full disciplinary committee hearing at which he could plead his defense and

mitigation before punishment was imposed, and that had he obtained that hearing, he had good

arguments that may well have prompted the committee members not to dismiss him. The school

argued to the court that under the Fay School Handbook, no such hearing was required. The

Court ruled as follows, denying summary judgment. *Id.* at 225:

> For purposes of this case, the question becomes, would a reasonable student in
> DMP's position, *i.e.,* a student who has admitted to two major rules violations
> while on final probation (cheating on a quiz and lying to an advisor), *reasonably*
> *believe that the Head of School had the discretion to unilaterally expel him*
> *without first providing him the opportunity to appear before the DC with his*
> *advisor or an advocate of his choice*? . . . I cannot answer that question.

In the face of the language in the Massachusetts cases cited above, it is not enough to

dispose of Walker's breach of contract claim on the plagiarism finding, as Harvard attempts, by

its argument that there was no breach of contract "[b]ecause *Harvard* reasonably expected

Walker to understand that the Handbook's plagiarism rule applied to her February 24 draft . . ."

[Harvard Memo, p 10.]  (emphasis added). Not only do the disputed facts in this case render this

half of the test (the part preferred by Harvard) not resolvable by summary judgment (see further

below), consideration must also be given to the reasonable expectation of Walker as to whether

that rule applied to her draft of February 24 in the circumstances described above.

This dual consideration applies to the disciplinary procedures in the Handbook.

**Construction of the Handbook Is Not In This Case Subject To Any**
**"Deference" to Harvard's Interpretation.**

Harvard is not entitled to "deference" in its interpretation of its rules, nor should this

Court scrutinize its conduct under these rules using the "arbitrary and capricious" standard. *See*

Harvard Memo, p. 8.  Those standards apply only if there are no Handbook rules in place

covering the dispute.  To begin with, *City of Cambridge v. Civil Serv. Comm'n*, 43 Mass. App.

Ct. 300, 303 (1997) (Harvard Memo, p. 8), cited in support of this tolerant standard, is entirely

off point. It was a court challenge by a police officer to a decision by the City of Cambridge to

bypass her for a promotion she had sought.  The Civil Service Commission and then the Superior

Court had reviewed the City's decision under the "arbitrary and capricious" standard. The Court

of Appeal found that to be the wrong standard because, under Mass. G.L. c. 31, § 2(b), the

correct standard is "whether there is reasonable justification for the decision taken." *City of*

*Cambridge* 43 Mass App. at 303. This case obviously does not establish or discuss the standards

by which courts decide student – school disputes concerning disciplinary matters.

Nor do the other cases cited by Harvard. *Berkowitz v. President & Fellows of Harvard*

*Coll.,* 58 Mass. App. Ct. 262, 269-70 (2003) simply does not stand for Harvard's unqualified

proposition that courts are not to intrude into university decision-making absent evidence that the

decision is "arbitrary or capricious." (Harvard Memo p. 8.) Initially *Berkowitz* involved the

clearly different context of a suit over Harvard's denial of tenure to a professor – a University

decision the Supreme Judicial Court recognized to involve highly subjective faculty judgments

regarding the University's decision concerning a professor. Yet even in that context, a deferential

standard does not apply if there is a contract provision governing the dispute:

> Therefore, *in the absence of a violation of a reasonable expectation created by*
> *the contract*, see *Schaer v. Brandeis Univ.,* 432 Mass. at 478, 735 N.E.2d 373, or
> arbitrary and capricious conduct by the university, see *Coveney v. President &*
> *Trustees of the College of the Holy Cross,* 388 Mass. 16, 19–20, 445 N.E.2d 136
> (1983), courts are not to intrude into university decision-making.

*Berkowitz,* 58 Mass. App. Ct. at 269-70. More directly relevant is yet another case cited by

Harvard in its quest for refuge under the more favorable "deferential standard." See *Cloud v.*

*Trustees of Boston University*, 720 F.2d 721, 725 (1983), cited at Harvard Memo at p. 8. Yet

*Cloud* makes plain that this deferential standard is not followed where there is a Handbook term applicable to the dispute, such as in Walker's case:

> This deferential standard of review applies when, as in *Coveney,* there is no contractual right to a hearing. Where, as here, the university specifically provides for a disciplinary hearing before expulsion, *we review the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules.* (*citation omitted*) We *also* examine the hearing to ensure that it was conducted with basic fairness.

*Cloud, supra,* 720 F.2d 724-25.  Clearly, this case must be determined by a review of the actions of Harvard "to ensure that they fall within the reasonable expectations of one reading the relevant rules."   Indeed, far from the deference Harvard seeks, the handbook terms should be construed most favorably to any reasonable understanding a student could give the terms involved, and any uncertainties should be resolved against Harvard, not the student. Harvard, with all its vast legal resources, unilaterally drafted the Handbook and presented it to arriving students on a take-it-or leave-it basis. As with any such adhesion contract:

> The handbook was issued by Brandeis unilaterally. As such, any ambiguities in the contract should be construed against the drafter, especially, as here, where there is no opportunity for meaningful negotiation of any of the terms. See *Corso v. Creighton Univ.,* 731 F.2d 529, 532–533 (8th Cir.1984) (interpreting terms in university handbook by rules of standard contract interpretation, court construed terms against drafter).

*Schaer v. Brandeis University*, 432 Mass. at 483 (Ireland, J., and Cowan, J., dissenting on the main holding). Far more is arguable at stake here than in the case of a commercial boilerplate contract.  The student has invested, and has at risk, not only a small fortune, but also her entire scholarly and extra-curricular life, years spent striving to gain acceptance into a school such as Harvard, and her future career. Unlike with the purchase of a bad car, the consequences of being found on the wrong side of a major school rule are irreversible. Walker had job offers from two prestigious firms when she was found to have plagiarized – Fish and Richardson and Goodwin

Procter. Both evaporated as a result of the finding by Harvard, and she has since been rejected by hundreds of firms despite a record that would otherwise make her an attractive candidate. She now does legal/paralegal work at a level of financial and professional reward well below what she would otherwise have obtained, and she is foreclosed from all the promising public and private sector opportunities for which her impressive record otherwise would have qualified her. Nor can she start over, as any car buyer can. This sticks to her like the professional equivalent to Hawthorne's Scarlet Letter.

In this context the notion that Harvard is entitled to any deference in terms of the interpretation of a contract it wrote should be rejected out of hand.

### III. SUMMARY JUDGMENT IS NOT WARRANTED ON THE PLAGIARISM-RELATED COUNT GIVEN THE APPLICABLE LAW AND THE EVIDENCE

Even a quick read of the fact versions offered by Walker and Harvard show many genuine issues of fact, including whether she had alerted JOLT to the virus, whether she told Ungberg of the incomplete stage of her latest draft, and whether she had alerted JOLT generally to her need to continue working on this draft. The parties are even at greater odds about the "understandings' Walker had at the time.

Harvard contends that Walker understood the subcite process undertaken when drafts are ready, the normal timing of author edits and that "she would not be able to make any changes between her submission of the *final* draft in late February and the time for author edits at the end of March." Harvard Memo p. 2. Walker simply did not have these understanding about her draft – which she called her "latest draft" - and provided many alerts about its uncompleted state and her continuing to work on it. Compare Harvard Fact 40 with Walker Response Fact 40. A genuine issue of fact exists as to whether Walker was offering this "latest draft" as a submission that could go to the next step, and is particularly relevant to consideration as to  whether Walker

understood, or that it was reasonable for her to have understood, that what she was turning in on

February 24, with all her qualifications about it, and while she was, and they knew she was,

continuing to work on a new draft, would be  a "submission"[7] subject to the plagiarism rule.

That rule provides in relevant part: (See Harvard Fact No. 8):

> All work submitted by a student for any academic or non-academic exercise is
> expected to be the student's own work.  In the preparation of their work, students
> should always take great care to distinguish their own ideas and knowledge from
> information derived from sources.  * * * Students who are in any doubt about the
> preparation of their work should consult the appropriate instructor, supervisor, or
> administrator before it is prepared or submitted. Students who submit work that is
> not their own without clear attribution of all sources, even if inadvertently, will be
> subject to disciplinary action

Unlike Harvard's Memo, the Handbook does not define "submission." Yet Harvard now

seeks to hold Walker to knowledge of an Oxford Dictionary-based transitive/intransitive

distinction concerning the word "submitted." (Harvard Memo p. 9)  It also argues (*Id.*) that the

Handbook makes no distinction for work that is incomplete," yet the Handbook does not say so.

To Harvard's assertion that the Handbook makes no exception for any missing attribution

"if the author intends later to supply it," (*id.*)  it is nowhere near as clear as Harvard contends that

this provision applies to Walker's circumstances, where (1) she was still working on another

version of the draft and said so, (2) sent into JOLT with the incomplete draft copies of all the

sources related to that draft *including* those from which quotes were taken and placed in the draft

but which quotes had not yet been attributed, *and* (3) the draft obviously had to be cut because it

was substantially over the word limit. Finally, on the wording of the plagiarism rule, while it is

true that the Handbook makes plain that even "inadvertent" missing attributions are potential

---

[7]      Harvard (Memo p. 9) trumpets that when her draft was given to JOLT, it was not
"fragmented and incomplete." (Harvard  Memo  p. 8.) She never never testified that it was fragmented;
that was simply an allegation in her complaint. She did testify and indeed Fact Response 40
shows with abundance that she had told JOLT many different ways that it was not complete.

violations, that does not mean or make clear that this is so for unfinished works in progress. The point in Walker's case was not that she forgot, or overlooked attributions that ought to have been included, but rather that her work was in the state described herein. And Walker told JOLT editors of all these problems, thus consulting as she thought appropriate under the rule. The answer was, 'get it in now.' See page 6, above.

## IV. A QUESTION OF FACT EXISTS AS TO WHETHER THE HEARING MET WALKER'S REASONABLE EXPECTATIONS UNDER THE HANDBOOK

It is not only, despite what Harvard contends (Memo p. 17), whether the disciplinary hearing was "conducted with basic fairness." That is only part of the test. The other part is whether the hearing met the student's reasonable expectation in light of the Handbook rules.

> Where, as here, the university specifically provides for a disciplinary hearing before expulsion, *we review the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules*. (*citation omitted*) We *also* examine the hearing to ensure that it was conducted with basic fairness.

*Cloud v. Trustees of Boston Univ.*, *supra,* 720 F.2d at 724-25 (emphasis added). A question of fact exists as to whether, given the hearing described at pages 10 to12 above, it met the reasonable expectations of Walker. That is a question of fact.

## V. THE LIBEL CLAIM STANDS OR FALLS ON WHETHER WALKER ACTUALLY COMMITTED PLAGIARISM

Walker submits that Harvard's argument on the plagiarism count is circular and not persuasive. Its presence on her transcript is a publication since it has been sent out to hundreds of prospective employers at her request, in order to provide a required transcript. While literally true that Walker was found guilty of plagiarism, it was Harvard that so found. If its finding was not true, a question for the jury, Harvard is literally hiding behind what it told itself and then published as if it were just reporting what had been reported to it. Harvard cites no case for such

a large loophole in the libel law, particularly when applied to large institutions which routinely communicate through various departments with the end result being the institutional representation. .

Last, the proposition here that that Harvard has a qualified privilege to label Walker as it has is supported by dubious authority. It cites the thirty-year-old case of *Bratt v. International Business Machines Corporation,* 392 Mass. 508, 467. N.E.2nd 126 (1984), in which Bratt sued IBM for libel because a supervisor had disclosed to several managers that Bratt was suffering mental problems and a psychiatrist had diagnosed him as being paranoid. The court held that the dissemination of this information warranted protection under a qualified privilege because it was "reasonably necessary to the protection or furtherance of a legitimate business interest," to do so. 392 Mass. at 512-13.  That is a far cry from Harvard's dissemination of a plagiarism finding if it is false.  A jury should decide that without regard to any qualified privilege.

## CONCLUSION

The motion for summary judgment should be denied.

Dated: February 14, 2014

      /s/ John J.E. Markham, II
John J.E. Markham, II (BBO #638579)
MARKHAM & READ
One Commercial Wharf West
Boston, MA 02110
Tel. (617) 523-6329
Fax (617) 742-8604
jmarkham@markhamread.com
*Attorneys for Plaintiff Megon Walker*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was served electronically to counsel for all defendants on this date via the CM/ECF filing system.

/s/ Bridget A. Zerner
Bridget A. Zerner

Dated:   February 14, 2014